FOURTH DIVISION

November 22, 2000 

No. 1-98-1387

Illinois Central Railroad ) Appeal from the

Company, ) Circuit Court of

) Cook County.

Plaintiff-Appellant, )

) 

) No. 97 CH 7647

) 

Accident and Casualty Company of )

Winterthur 
et al.
, ) Honorable

) Dorothy Kirie Kinnaird,

Defendants-Appellees.           )            Judge Presiding.

JUSTICE BARTH delivered the opinion of the court:

This coverage dispute between plaintiff Illinois Central Railroad Company (IC) and its 35 excess insurers (collectively defendants) has been before this court previously.  See 
Kerr v. Illinois Central R.R. Co.
, 283 Ill. App. 3d 574 (1996).  There we held that IC's notice to its first-layer excess insurers was untimely.  IC now appeals from the circuit court's March 20, 1998, order granting summary judgment to defendants and its October 20, 1997, order denying IC's motion for partial summary judgment on the issue of trigger of coverage and granting partial summary judgment to defendants on the issues of trigger of coverage, allocation and exhaustion of self-insured retentions (SIR).  The circuit court incorporated its October 20, 1997, ruling into its March 20, 1998, final order.  These rulings by the circuit court resulted in IC being required to absorb the entire loss stemming from its unsuccessful defense and ultimate settlement of a class action employment discrimination suit.  The defense and settlement cost IC more than $13 million for which, in the present litigation, it seeks indemnification. 

BACKGROUND

I.  The Underlying Discrimination Suit

In 1981, Robert Earl Mister filed a federal civil rights action against IC on behalf of a class of would-be laborers, alleging discriminatory hiring practices (hereafter the 
Mister
 litigation).  IC prevailed at the district court level, with the court holding that while a 
prima facie
 case of disparate treatment had been established, IC had rebutted it by showing that distance from home to workplace and a practice of local hiring accounted for the apparent racial disparity in hiring.  
Mister v. Illinois Central Gulf R.R. Co.
, 639 F. Supp. 1560 (S.D. Ill. 1986).  On appeal, however, the Seventh Circuit Court of Appeals reversed the district court and remanded the case for proceedings to determine damages.  
Mister v. Illinois Central Gulf R.R. Co.
, 832 F.2d 1427 (7th Cir. 1987).  In 1993, after commencement but before conclusion of proceedings on remand, the parties agreed to settle the case for $10 million, wherein each of the 583 class members received $5,656.56.  During the course of the litigation IC expended approximately $3 million in attorney fees and costs. 

II.  The First Coverage Dispute

IC gave notice to its insurers of a potential claim in excess of its $1.5 million SIR only after the Seventh Circuit's reversal.  Thereafter, in 1991, certain underwriters at Lloyd's, London and certain London Market Insurance Companies (collectively the London Insurers) filed a declaratory judgment action, claiming that IC's notice was untimely pursuant to the policies.  Therefore, it was argued, they were not obligated to indemnify IC for losses arising out of the 
Mister
 litigation.  The London Insurers provided the first layer of coverage in excess of IC's SIR, 
i.e.
,
 between $1.5 million up to $4 million.  IC filed a counterclaim against the London Insurers, and also filed a third-party action against several of its other insurers.  The circuit court, upon a finding that IC had failed to provide timely notice, granted summary judgment in favor of the London Insurers as to the policies providing the first-layer of coverage and to other third-party defendant insurers which had joined in the motion.  This court affirmed the circuit court's judgment.  
Kerr v. Illinois Central R.R. Co.
, 283 Ill. App. 3d 574 (1996).

III. The Second Coverage Dispute

Following issuance of the 
Kerr
 opinion, the parties were, on IC's motion, realigned in the circuit court so that IC was the plaintiff and its insurers were the defendants.  On May 23, 1997, IC filed an amended complaint seeking a declaration that its insurers were obligated to indemnify it for defense and settlement costs resulting from the 
Mister
 litigation.  The complaint did not distinguish among the various insurers except to say that, during the allegedly relevant time period (June 1, 1975, through June 1, 1979), IC purchased liability insurance from defendants providing four separate layers of coverage.  The first layer provided coverage from $1.5 million up to $4 million; the second layer from $4 million up to $6 million; the third layer, from $6 million up to $11 million; and the fourth layer, from $11 million up to $16 million.

In July 1997, IC filed a motion for partial summary judgment concerning the reasonableness of notice to all insurers providing coverage above the first layer of excess coverage.  In August 1997, IC filed another motion for partial summary judgment concerning "occurrence" and "trigger of coverage" issues.  IC argued that the facts of the 
Mister
 litigation and the unambiguous policy language established that the 
Mister
 discrimination claims constituted a single, continuing occurrence triggering coverage only under those policies in effect during the 1975-1976 policy period, and that those insurers were obligated to indemnify IC for its $13 million loss, subject only to each policy's upper and lower limits.  The occurrence, according to IC, was the delegation of hiring authority to Mary Annette Lane in 1975, for IC's St. Louis, Missouri, division.  

The London Insurers, Century Indemnity Company (successor to CIGNA Speciality Insurance Company, f/k/a California Union Insurance Company), Bellefonte (U.S.) Insurance Company and Stonewall Insurance Company responded to IC's motion and filed their own cross-motion for partial summary judgment on the issues of "trigger of coverage" and "allocation."  Continental Insurance Company (successor to certain policies issued by Harbor Insurance Company, n/k/a Greenwich Insurance Company) joined in defendants' response and motion.

Defendants argued that the 
Mister
 claims grew out of discriminatory hiring practices spanning many years and involving multiple occurrences.  Based upon the 
Mister
 class definitions, which included would-be laborers who applied with IC between January 8, 1976, to November 4, 1982, they asserted that the claims arising from the railroad's discriminatory hiring practices implicated six policy periods.
(footnote: 1)    

Defendants further argued that IC must first horizontally exhaust its SIR ($1.5 million) and its first layer of excess coverage ($1.5 million to $4 million) for each of the policy years at issue before it may reach its second layer of coverage provided by defendants.

In September 1997, IC filed a motion for reconsideration apparently in anticipation of the possibility of an adverse ruling on defendants' motion.  IC stated that if defendants' motion for partial summary judgment finding multiple occurrences were to be granted, it would then petition the court pursuant to section 2-1401 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1401 (West 1996)), to reconsider its March 21, 1995, ruling (affirmed in 
Kerr
) that IC's notice to the first-layer excess insurers was untimely.  IC argued that implicit in the circuit court's late notice ruling was the conclusion that the 
Mister
 claims were recoverable from a single policy period.  IC claimed that, because its expert's analysis of the 
Mister
 case showed a potential exposure of $2 million, it was held, in 
Kerr
, to be under a duty to give notice to the first-layer excess insurers, whose inception amount was $1.5 million.  However, IC argued, if the estimated potential $2 million loss were allocated over six years, then the loss attributable to any single policy period would fall far short of the $1.5 million inception.  In that case, IC would have been under no duty to give notice to its excess insurers.

On October 20, 1997, the trial court granted IC's motion for partial summary judgment to the extent that it found the 
Mister
 claims gave rise to a single occurrence.  That occurrence, according to the circuit court, was the delegation of hiring authority to Mary Annette Lane.  However, the court granted defendants' motion for partial summary judgment finding that multiple policies in force during the years covered by the 
Mister
 class definitions were triggered.  Further, the court ruled that liability attached to a triggered policy only for that portion of the damages allocable to the period such policy was in force.  The court noted that damages sustained by 
Mister
 class members could be "easily allocated."  Finally, the circuit court agreed with defendants that IC must first horizontally exhaust its SIR for each triggered policy period before looking to coverage from its excess insurers.

IC moved the circuit court to reconsider its October 20, 1997, ruling, arguing 
inter alia
, that it ignored the so-called "deemer" or "telescope" clause contained in the policies, which had the effect of "sweeping back" all the damages into the 1975-1976 policy.  That clause provided that "[e]ach 'occurrence' 
shall be deemed
 to commence on the first happening of any material damage not within the period of any previous 'occurrence'."  (Emphasis added.)

While IC's motion for reconsideration was pending, the London Insurers filed a motion for summary judgment.  They argued that IC must exhaust the first $4 million of losses in each of seven, rather than six as previously argued, relevant policy periods (IC's $1.5 million SIR and its first-layer of excess coverage amounting to $2.5 million) before looking to its second-layer insurers.  However, because IC's loss in any given policy period did not exceed $4 million, they argued that IC was not entitled to any reimbursement as a matter of law.  Century Indemnity Company filed a motion for summary judgment making an identical argument.

Stonewall Insurance Company also moved for summary judgment, arguing that its policies covered periods prior to the onset of damages.  Stonewall further argued that it issued fourth-layer coverage,
 i.e.
, coverage in excess of $11 million, and that based upon the circuit court's October 20, 1997, ruling, Stonewall's coverage would never be reached.

On March 20, 1998, the circuit court granted defendants' motions for summary judgment.  The order allocated the $10 million settlement and $3,088,547 in defense costs over seven years beginning with the 1975-1976 policy year and ending with the 1981-1982 policy year.  The court determined that: (1) IC must horizontally exhaust its $1.5 million SIR in each policy year; (2) IC is not entitled to reimbursement from its first-layer providers (in accordance with this court's 
Kerr
 decision); and (3) the loss, as allocated, does not exceed $4 million in any one policy year; therefore, IC was "not entitled to any reimbursement whatever from its excess insurers."

The circuit court also denied IC's motion for reconsideration of its October 20, 1997, order denied IC's motion for reconsideration of its March 21, 1995, ruling as to the timeliness of notice to the first-layer excess insurers and determined that IC's motion for summary judgment as to the timeliness of notice to insurers above the first layer of coverage was moot.  IC now appeals.

ANALYSIS

I.  Requirement of a Cross-Appeal 

Defendants argue that summary judgment in their favor is proper for the separate reason that there was at least one occurrence in each of the relevant policy years.  Thus, defendants challenge the trial court's October 20, 1997, ruling that there was a single, continuing occurrence.  IC claims that this issue is not properly before this court because part of the trial court's ruling was adverse to defendants and that they failed to file a cross-appeal.

In general, "[a] party cannot complain of error which does not prejudicially affect it, and one who has obtained by judgment all that has been asked for in the trial court cannot appeal from the judgment."  
Material Service Corp. v. Department of Revenue
, 98 Ill. 2d 382, 386 (1983); see also
 
Geer v. Kadera
, 173 Ill. 2d 398, 413-14 (1996).  Even though a successful party may not agree with the reasons, conclusions or findings of the lower court, it is improper to provide that successful party with a forum in a reviewing court.
  
Geer
, 173 Ill. 2d at 414. 

IC misconstrues the final judgment entered below.  Although the circuit court, on October 20, 1997, rejected defendants' argument that there were at least six separate occurrences, on March 20, 1998, the court entered its final order granting summary judgment in favor of defendants, finding that IC was "not entitled to any reimbursement whatever from its excess insurers."  Thus, defendants obtained all that they asked for in the circuit court, albeit on grounds different from what they argued.  Because the final judgment is entirely in defendants' favor, specific findings adverse to defendants do not require a cross-

appeal in order for this court to address those findings.  See
 
Solimini v. Thomas
, 293 Ill. App. 3d 430, 435 (1997).  
Therefore, we will consider defendants' argument regarding the number of occurrences.

II.  Number of Occurrences

IC argues that the circuit court properly ruled that the 
Mister
 claims arose out of a single, continuing occurrence, 
that being IC's delegation of hiring authority to Lane in 1975.  In response, defendants argue that the
 
Mister
 claims resulted not from the delegation of hiring authority to Lane, but rather IC's discriminatory hiring practices, which spanned many years and may have involved hundreds of occurrences.

When construing an insurance policy, this court's primary function is to ascertain and enforce the intentions of the parties as expressed in the agreement.  
De Los Reyes v. Travelers Insurance Cos.
, 135 Ill. 2d 353, 358 (1990).  When ascertaining the meaning of the words used in the policy and the intent of the parties, it is proper to construe the policy as a whole, while taking into account "the type of insurance for which the parties have contracted, the risks undertaken and purchased, the subject matter that is insured and the purposes of the entire contract."  
Crum & Forster Managers Corp. v. Resolution Trust Corp.
, 156 Ill. 2d 384, 391 (1993).  
The construction of the provisions contained in an insurance policy is a question of law that can properly be decided in a motion for summary judgment.  
Crum & Forster
, 156 Ill. 2d at 391.
  "S
ummary judgment is appropriate when there is no genuine issue of material fact and the moving party's right to judgment is clear and free from doubt."  
Espinoza v. Elgin, Joliet & Eastern Ry. Co.
, 165 Ill. 2d 107, 113 (1995).  When ruling on a motion for summary judgment, it is proper to construe all evidence in the light most favorable to the nonmoving party and strictly against the moving party.  
Espinoza
, 165 Ill. 2d at 113.  Finally, we review the circuit court's summary judgment rulings 
de
 
novo
.  
Outboard Marine Corp. v. Liberty Mutual Insurance Co.
, 154 Ill. 2d 90, 102 (1992).

The insurance policies at issue provide in relevant part:

"This policy indemnifies the Assured for any and all sums which the Assured shall become legally liable or obligated by contract to pay to any person or persons as compensation or damages for injury or damage to any person or persons *** and for injury or damage to property *** arising out of any occurrence or occurrences caused by or growing out of the Assured's operations and/or any operations incidental thereto during the term hereof; and to indemnify the Assured for legal, investigation and, other expenses ***. 

***

*** [T]here is no limit to the number of accidents or occurrences for which claims may be made provided such accidents or occurrences take place during the term hereof. 

***

The term 'occurrence' shall mean one or more accidents or disasters and/or series of accidents or disasters arising out of or resulting from one event.

***

Each 'occurrence' shall be deemed to commence on the first happening of any material damage not within the period of any previous 'occurrence'.

 ***

The term 'injury or damage to any person or persons' as used in this Policy shall be construed to include *** discrimination ***." 

In its motion for summary judgment, IC pointed out that the 
Mister
 class, as constituted by its definition in the underlying litigation, consisted of all black persons who had applied for and been denied employment with IC's St. Louis, Missouri, division from 1976 to 1982.  IC further asserted that during that time frame, hiring decisions for the division were consolidated in the Carbondale headquarters and were made there by a single person, the aforementioned Lane.  This delegation of hiring authority, according to IC, was the event that led to all of the discrimination injuries which resulted in the 
Mister
 litigation.  The circuit court agreed finding that the delegation of hiring authority to Lane was a single, continuing occurrence that caused injuries and damage to the 
Mister
 class members.
(footnote: 2)
In Illinois, the number of "occurrences" involved in liability policies is determined by using the "cause," rather than the "effect" theory.  
United States Gypsum Co. v. Admiral Insurance Co.
, 268 Ill. App. 3d 598, 648 (1994); 
Illinois National Insurance Co. v. Szczepkowicz
, 185 Ill. App. 3d 1091, 1094-

95 (1989).  Under the "cause" theory, the number of "occurrences" is determined by referring to the cause or causes of the damage, rather than to the number of individual claims or injuries, as is the case under the "effect" theory.  
United States Gypsum
, 268 Ill. App. 3d at 648; 
Szczepkowicz
, 185 Ill. App. 3d at 1094-95.

 What constitutes an "occurrence" within the context of employment discrimination has not yet been decided in Illinois.  In support of its assertion that the 
Mister
 litigation involved only one occurrence, IC points to 
Appalachian Insurance Co. v. Liberty Mutual Insurance Co.
, 676 F.2d 56 (3d Cir. 1982), 
Liberty Mutual Insurance Co. v. Those Certain Underwriters at Lloyds
, 650 F. Supp. 1553 (W.D. Pa. 1987),
(footnote: 3) and 
Transport Insurance Co. v. Lee Way Motor Freight
, 487 F. Supp. 1325 (N.D. Tex. 1980). 

In 
Appalachian Insurance Co. v. Liberty Mutual Insurance Co.
, 676 F.2d 56 (3d Cir. 1982)
, female employees at Liberty Mutual brought suit in May 1971 alleging that the company maintained employment policies that discriminated against them.  The case eventually settled and Liberty sought indemnification from Appalachian, its insurer from August 1, 1971, to August 1, 1974.  Appalachian argued that indemnification was improper because Liberty had adopted its discriminatory employment policies in 1965; therefore, the occurrence of loss and the impact from that occurrence took place prior to the effective date of its policies.  The district court agreed and granted Appalachian's motion by applying the cause theory and finding that Liberty's claim for indemnification was based on a single occurrence, which took place prior to the policies' effective dates.  The Court of Appeals for the Third Circuit affirmed, rejecting the argument that multiple occurrences over an extended period of time had occurred based upon multiple injuries.  
Appalachian
, 676 F.2d at 61. 

In 
Transport Insurance Co. v. Lee Way Motor Freight, Inc.
, 487 F. Supp. 1325 (N.D. Tex. 1980), an insurance company sought a determination as to its liability for damages which Lee Way, the insured freight company, incurred in an underlying discrimination suit.  The district court ruled that the freight company was required to bear only one deductible amount because the pattern and practice of discrimination it had undertaken against black employees constituted only one occurrence under the relevant policies despite the fact that the discrimination occurred in four separate locations and over multiple policy periods.  In arriving at this determination, the district court looked to the underlying discrimination suit and found that the freight company's implementation of a "corporate policy," which was traceable to decisions and procedures made at its headquarters, resulted in discrimination on a "system-wide basis."  
Transport
, 487 F. Supp. at 1328-29.

Defendants argue that IC's discriminatory hiring practices occurred over six years and involved seven separate policies.  They assert that at least one "occurrence" resulted during each policy period in which new damages were suffered by members of the 
Mister
 class who were not covered under the previous periods' policies.  Defendants focus on the indemnification language set out above, which provides that the insurers will indemnify IC for injuries "arising out of any occurrence or occurrences caused by or growing out of the Assured's operations and/or any operations incidental thereto during the term hereof."  According to defendants, "during the term hereof" can only mean during the particular policy period that a refusal to hire a class member took place, and that each year IC's six-year discriminatory hiring practices continued constituted, at a minimum, a separate occurrence.  In support of their position, defendants rely on 
Roman Catholic Diocese of Joliet, Inc. v. Lee
, 292 Ill. App. 3d 447 (1997).
(footnote: 4) 

In 
Roman Catholic Diocese
, this court considered whether a priest's sexual molestation of a single minor victim over two policy periods constituted occurrences in both policy periods.  The court held that whether analyzed from the standpoint of principles governing negligent supervision of an employee or from the language of the policies in question as they define occurrence, there were two occurrences.  The court found persuasive the policies' definition of occurrence, 
i.e.
, "a continuous or repeated 
exposure
 to conditions which *** result in personal injury *** during the policy period."  (Emphasis in original.)  
Roman Catholic Diocese
, 292 Ill. App. 3d at 455.  The court quoted further definitional language stating that "[a]ll such 
exposure
 to substantially the same general conditions existing at or emanating from one location shall be deemed one occurrence."  (Emphasis in original.)  
Roman Catholic Diocese
, 292 Ill. App. 3d at 455.
  Based upon the policy language, this court concluded that negligent supervision alone did not trigger any obligation on the part of the insurers.  Rather, it was the minor's exposure to the negligently supervised priest in each of the policy periods that constituted a separate occurrence which provided the basis for indemnification.  
Roman Catholic Diocese
, 292 Ill. App. 3d at 455-56.  In making this determination, the court cited 
Mason v. Home Insurance Co.
, 177 Ill. App. 3d 454 (1988).  There, numerous patrons were stricken with food poisoning after eating at the insured's restaurant over a three-day period.  This court found that the serving of contaminated food to the patrons was the act from which liability arose.  Rejecting the notion that the patrons' claims arose out of one uninterrupted and continuing cause, the 
Mason
 court held that each incident in which tainted food was served to a patron constituted a separate occurrence.
  
Mason
, 177 Ill. App. 3d at 460.  

We disagree with the circuit court's determination that the delegation of hiring authority to Lane constituted as a matter of law a single event resulting in one occurrence causing injuries to each 
Mister
 class member during the time span encompassed by the class definition.  In our view, 
Appalachian
 and 
Transport
 offer no guidance for resolution of this case.  As defendants point out, there is no well-defined and consistently applied policy here, in contrast to the circumstances present in those cases
.  We find that difference to be a significant and critical factor distinguishing the instant case from those relied upon by IC
.  Here, IC does not contend that any of Lane's superiors instructed her to follow or informed her of any corporate policy promulgated by IC's senior management or traceable to decisions made at its corporate headquarters.  IC attempted to justify its hiring as nondiscriminatory by professing to hire locally, but that was belied by the evidence adduced as it applied to relevant employees in nonmobile jobs.  See 
Mister
, 832 F.2d at 1430.  In contrast, in 
Appalachian
 and 
Transport
, there existed specifically declared and promulgated corporate policies that impacted in a discriminatory manner against women or blacks.  The adoption of the policies complained of were the cause of the discriminatory acts and thus, in each case, a single occurrence.  There is nothing inherently discriminatory about IC's delegation of hiring authority to Lane.

We liken Lane's acts of denying employment to black would-be laborers to the priest's conduct in 
Roman Catholic Diocese
.  Just as molestation of the minor in two separate policy periods constituted two separate occurrences, so too here, each time Lane exercised her authority in hiring in a discriminatory manner against a member of the 
Mister
 class, a separate and discrete occurrence resulted.  While the definition of "occurrence" in 
Roman Catholic Diocese
 included "exposure," here, the definition of "occurrence" likewise supports a finding that multiple occurrences resulted.  Each 
Mister
 class member was subjected to "one or more accidents or disasters *** arising out of or resulting from one event," that being Lane's refusal to hire him, not the mere placing of her in a position where she made hiring decisions.

IC argues that we have in the case at bar a single occurrence, which spanned multiple policy years.  In support, it relies upon 
MoPac
, 288 Ill. App. 3d 69, where noise-induced hearing loss and asbestos claims each arose from a single occurrence that spanned multiple policy periods.  We believe the approach taken by this court in 
Roman Catholic Diocese
 represents the more suitable paradigm for the case 
sub judice
 than 
MoPac
, a case involving physical injuries caused over extended periods
.  Lane's conduct in the case at bar and the priest's conduct in 
Roman Catholic Diocese
 both involve a human agency committing a specific act, rather than the continuation of a process or condition.  

IC further argues that its liability was not premised upon individual acts of discrimination, but was based upon statistical findings from which was inferred a pattern and practice of discrimination over a period of years that affected the class as a whole.  See 
Mister
, 832 F.2d at 1429.  Thus, it maintains that there is no evidence that discrimination against the class members had multiple causes.  IC also contends that because the federal courts in the underlying litigation made a finding that Lane caused the discrimination, this court is thereby required to find a single occurrence. 

We do not dispute that it stands as established in the underlying litigation that IC engaged in discriminatory hiring practices through the actions of Lane, who was thus the cause of the discrimination, and that damages to the 
Mister
 class members resulted.  However, the purpose of the proceeding at bar is to determine whether the damage suffered in the underlying litigation falls within the scope of indemnities covered by the insurance contracts and, if so, the nature and extent of that indemnification.  These determinations are questions of law, not fact, and it is therefore appropriate for us to make legal conclusions based upon the facts established in previous proceedings.  See 
United States Gypsum
, 268 Ill. App. 3d at 623-24.  In any event, neither the district court nor the circuit court of appeals found an express policy in place and implemented by Lane or any other IC employee that resulted in discrimination.  Moreover, the federal courts were not called upon to determine the impact of the discrimination found to exist upon the nature and extent of the coverage IC received from the policies purchased in terms of number of occurrences, allocation of damages and exhaustion of policy limits
.   

Defendants have suggested that the record is "undeveloped" as to how and when IC promulgated its discriminatory hiring practices which led to the 
Mister
 plaintiffs' damages.  We deem, however, the record to be adequate to support the view that each action, 
i.e.
, rejection of a class member's application for employment by the railroad's clerk, was a separate and distinct event constituting an occurrence.  See 
Roman Catholic Diocese
, 292 Ill. App. 3d at 455-56. 

III.  Trigger of Coverage

 We turn next to the question of which policies must respond to, or are "triggered" by, the covered occurrences.  The coverage provision is clear: The "policy indemnifies *** for any and all sums which the Assured shall become legally liable *** to pay to any person *** as *** damages for injury *** arising out of any occurrence or occurrences caused by or growing out of the Assured's operations *** during the term hereof."  The policies further provide that "[e]ach 'occurrence' shall be deemed to commence on the first happening of any material damage not within the period of any previous 'occurrence'." 

IC claims that only the 1975-1976 policy, the one in effect when Lane assumed her position, was triggered as a result of the 
Mister
 litigation.  In support of this claim, IC refers to the so-called "deemer" clause in the policy, which provides: "Each occurrence shall be deemed to commence on the first happening of any material damage not within the period of any previous 'occurrence.'"  According to IC, the proper interpretation of the clause as it applies here is to "sweep back" all class members' damage to the policy period in which Lane was placed in her position with hiring authority and caused her first injury to a member of the 
Mister
 class.

Defendants argue that the policies triggered were those in effect at the time the applicants submitted their applications.  Their assertion is that IC's discriminatory hiring practices existed, and the accompanying injuries accrued, contemporaneously with the submission of each 
Mister
 class member's employment application.  It makes no sense, in defendants' view, to tie a policy's "trigger" to an event (Lane's placement) separate from the cause (Lane's action) and the injury (the discrimination).    

IC's argument that it is only the policy in effect in 1975-1976 that must respond to the 
Mister
 claims is premised upon the assumption that all of the damages to the
 class resulted from a single, continuous occurrence.  As we have stated above, the damage award and costs incurred due to the discrimination litigation resulted from multiple occurrences; each submission of an application by a 
Mister
 class member.  Accordingly, it follows that it is the policy in effect at the time an application was tendered by a would-be employee that must respond to his claim because the "first happening of any material damage" occurred at the time the futile application was submitted.  This view finds support in IC's amended complaint wherein it is admitted that about 175 blacks applied for jobs with the railroad on March 27, 1979, none of whom were interviewed or hired.  Therefore, because futile applications for employment were submitted over several years, policies issued during successive periods were triggered.
  

Defendants have suggested, and we agree, that the proper interpretation of the "deemer" clause within the context of employment discrimination cases would be a circumstance wherein the discrimination against an individual employee continued over time.  The policy triggered in that instance would be the one in effect when the injury (discrimination) first occurred, regardless of how long it might continue.  This would exemplify how a discrimination case could result in damages exceeding the instant policies' SIR, thus responding to IC's assertion that viewing this as a multiple occurrence case where multiple policies were triggered would render the "deemer" clause meaningless because no discrimination award to an individual could exceed the SIR.  

The record establishes that IC kept applications from potential employees on file for six months.  We construe the "deemer" clause, under the circumstances here present, applicable wherein an application's six-month life span may extend over two policy periods.  In such cases, the damages will be deemed to have occurred during the policy in which the first material damage (the presentation of the futile application) took place.  This interpretation would serve to resolve any question with regard to which policy must respond to the damage.  Therefore, we reject IC's contention that to accept an interpretation of the clause other than its own would render the deemer provision meaningless.

IV.  Allocation

IC was able to provide the circuit court with applications of only 267 out of the 583 
Mister
 class action members.  The circuit court allocated the damages resulting from those denied applications to the policies in effect at the time the applications were made.  As for the remaining 316 
class members for whom IC was unable to provide applications, the circuit court allocated their damages horizontally among the insurance policies in effect during the time covered by the 
Mister
 class definition (January 8, 1976, to November 4, 1982) using a 
pro rata
 time-on-the-risk formula.  The $10 million settlement was allocated as follows:

1975-1976 -- $1,083,068

1976-1977 -- $1,803,480

1977-1978 -- $1,048,763

1978-1979 -- $2,901,250

1979-1980 -- $1,614,800

1980-1981 -- $  774,320

1981-1982 -- $  774,320.
(footnote: 5)
As for the $3,088,547 in legal fees IC incurred during the course of the 
Mister
 litigation, the circuit court again allocated horizontally using a 
pro rata
 time-on-the-risk formula among the seven policies implicated in the 
Mister
 class definition.  Therefore, $441,221 was allocated to each policy.  This amount, when added to the settlement amounts allocated above, resulted in a total allocation after rounding as follows: 

1975-1976 -- $1,524,289

1976-1977 -- $2,244,701

1977-1978 -- $1,489,984

1978-1979 -- $3,342,471

1979-1980 -- $2,056,021

1980-1981 -- $1,215,541

1981-1982 -- $1,215,541.

This allocation is identical to that urged by defendants in their motion for summary judgment.  The circuit court further ruled that IC was required to exhaust horizontally one SIR for each policy triggered before looking to defendants for coverage. 

The "retention" provisions of the second layer policies in question provide that "Underwriters shall not be liable hereunder unless the Ultimate Net Loss amounts to $4,000,000 any one occurrence involving coverage *** and then only for the sum excess of $4,000,000 underlying Ultimate Net Loss *** subject to the limit $2,000,000 ***."

IC makes a series of arguments in support of its claim that because the circuit court found a single, continuing occurrence, it erred when it ruled that IC was required to exhaust seven retentions.  For example, IC cites the language contained in the retention provision and argues that the language of the policy clearly states only one retention must be exhausted for "any one occurrence involving coverage."  However, as we have previously stated, each time a 
Mister
 class member's futile application was submitted to IC, an occurrence resulted and a policy was triggered.  Thus,
 we agree with the trial court that IC was required to horizontally exhaust one SIR for each policy triggered.   

IC further argues that the damages and defense costs resulting from the 
Mister
 litigation should have been spread over, at most, only five policy periods (1975-1976 through 1979-1980), rather than seven policy periods, because IC was undergoing downsizing in the early 1980s and "failed to hire even a single worker in 1981 or 1982."

We agree with the lower court's allocation of damages for those class members for whom applications are available.  The damages to those class members were properly allocated to the policy in effect at the time the application was made and, as previously stated, therefore triggered.  It is true that IC failed to provide the circuit court with any applications involving would-be laborers who applied with the railroad during the 1980-1981 and 1981-1982 policy years.  However, those policies are implicated in the years encompassed in the 
Mister
 class definition, a time frame in which Lane held the position, which included duties involving hiring decisions.  IC was unable to allocate damages paid to 316 class members and the fees resulting from the 
Mister
 litigation based upon the time when the injury was suffered.  Therefore, the circuit court allocated the damages for the class members for whom no application was available and the legal fees using a 
pro rata
 time-on-the-risk method.  This, we consider, was proper under the circumstances presented here.  See 
Roman Catholic Diocese
, 292 Ill. App. 3d at 456-57.  We therefore affirm the determination by the circuit court as to the allocation of damages and legal fees.
  

V.  The Effect of 
Kerr
 on the Preceding Issues

The parties disagree as to the effect of our previous holding in 
Kerr v. Illinois Central R.R. Co.
, 283 Ill. App. 3d 574 (1996).  In its motion for reconsideration, IC asked the circuit court and ultimately this court to reexamine the decision in 
Kerr
 if we determine that policies subsequent to the initial policy period are triggered by the existence of occurrences during the respective policy periods covered by the 
Mister
 class definition.  IC argues that defendants and both the circuit and appellate courts "assumed" as part of their analysis in the 
Kerr
 phase of this litigation that all of the foreseeable damages would be recovered from a single policy period.  IC claims it was subjected to "bait and switch" tactics by the insurance carriers by being able in this phase of the litigation to switch to a "spread the loss" strategy.  IC argues that if the loss is to be spread out, then the maximum loss posited by its expert (see 
Kerr
, 283 Ill. App. 3d at 584) of $2 million would have amounted to less than $300,000 per policy period.  Thus, a claim in excess of $1.5 million per each covered policy period would not have been "likely" to a reasonable policyholder.  The issue, says IC, is not trivial because if this court were to affirm the lower court on the allocation and exhaustion issues, but reverse the earlier late notice ruling, IC would have a substantial recoverable claim resulting from the fact that the allocated amount of loss for the policy periods 1975-76, 1976-77 and 1978-79 all exceed $1.5 million.  IC argues that it is being subjected to "one set of rules for notification and then a new set of rules for indemnification."  

We disagree.  
Kerr
 decided the notice issue, but did not address questions of the number of occurrences, trigger of coverage, allocation of loss or SIR exhaustion.  See 
Allstate Insurance Co. v. Hoffman
, 21 Ill. App. 2d 314, 324 (1959) ("The requirements of the policy as to notice and the question as to whether the policy affords coverage are separate and distinct matters").  This court has not previously addressed, within the context of this litigation, these questions and we do not believe that the determinations made by us in this phase of the litigation with respect to number of occurrences, allocation and exhaustion require that we revisit the notice issue.

For the reasons above stated, the judgments of the circuit court are affirmed.

Affirmed.

HOFFMAN and HALL, JJ., concur
.

FOOTNOTES
1:
Because the policy periods in question each began on June 1 and ended the following year on June 1, seven, rather than six, policy periods were actually implicated based upon the class definition.

2:
The circuit court never expressly found that there was a single, continuing occurrence.  Nonetheless, it is implied from the circuit court's reliance on 
Missouri Pacific R.R. v. International Insurance Co.
, 288 Ill. App. 3d 69 (1997) (
MoPac
), which addressed allocation of a loss arising out of a "single continuous occurrence" implicating successive policy periods.  
MoPac
, 288 Ill. App. 3d at 78.  IC refers to the court's finding as a "multi-year occurrence," and defendants refer to the court's finding as a "single, continuing occurrence."

3:
The case 
Liberty Mutual Insurance Co. v. Those Certain Underwriters at Lloyds
, 650 F. Supp. 1553 (W.D. Pa. 1987), was related to the litigation involved in 
Appalachian Insurance Co. v. Liberty Mutual Insurance Co.
, 676 F.2d 56 (3d Cir. 1982).  Because the court of appeals' determination that only one occurrence resulted in the underlying discrimination suit was not at issue in 
Liberty Mutual v. Those Certain Underwriters
, that case will not be discussed here.

4:
Defendants also cite 
Lee v. Interstate Fire & Casualty Co.
, 86 F.3d 101 (7
th
 Cir. 1996), in support of their claim that multiple occurrences resulted in the case at bar.  However, 
Lee
 is not instructive on this issue because the court did not determine the number of occurrences. 

5:
Because of rounding off figures, the amount actually allocated is $10,000,001.