THIRD DIVISION

November 14, 2001

No. 1-00-3780

MAREMONT CORPORATION,               ) Appeal from the

                                      ) Circuit Court of

     Plaintiff-Appellant, ) Cook County

) 

)

) 

CONTINENTAL CASUALTY COMPANY, and )

EDWARD WILLIAM CHESHIRE, et al.,   ) Honorable

) Albert Green,

Defendants-Appellees. ) Judge Presiding.

JUSTICE WOLFSON delivered the opinion of the court: 

Maremont Corporation was held responsible for the cost

of cleaning up pollution at six property sites or landfills over

a 40-year period.  The clean-up cost several million dollars.  To

recoup, Maremont first sought coverage from its primary insurance

carriers.  After the primary policies were disposed of, Maremont

then made claims against its excess coverage insurance policies.  This case is the product of those claims for excess coverage.

     Maremont filed this declaratory judgment action against nine insurance companies, including Continental Casualty Company (Continental) and Lloyd's of London (London).  Maremont alleged that under its excess coverage insurance policies with Continental and London, the insurers were required to indemnify it for damages arising out of the settlement of the environmental pollution suit.

Continental and London filed motions for summary judgment.  The trial court granted those motions, adopting a 
pro
 
rata
 allocation of damages and a requirement that Maremont horizontally exhaust its primary coverage before the excess  policies were reached.  We find there is no evidence Maremont's  claims reached any of the defendants' excess policies.  For that reason we affirm the trial court's order granting summary judgment.

FACTS

     Neither side disputes the underlying facts of the case.

     Maremont's operations led to liability for environmental pollution at plant sites in Easley, South Carolina; Needham, Massachusetts; and City of Industry, California.  Maremont also was held liable for pollution at landfills in Fort Wayne, Indiana; Hardage, Oklahoma; and Oklahoma City, Oklahoma.  The pollution at each of the sites was ongoing and, in some cases, spanned a period of 40 or more years.

     Maremont alleges it incurred "significant" damages for its settlement of claims and for cleanup of the affected sites.

Continental Policies

     Continental issued eight excess liability insurance policies to Maremont.  The first policy was issued in 1959 and lapsed in 1962.  Continental issued the second policy in 1968, and Maremont received continuing coverage from Continental until 1980, when the last policy lapsed.

     The first policy issued by Continental, in effect from 1959 through 1962, insured Maremont for losses in excess of $200,000.  It included the following language:

"[Continental will] indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of liability *** imposed upon the Insured by law *** for damages, direct or consequential, and expenses, all as more fully defined by the term 'ultimate net loss' *** on account of *** property damage, caused by or growing out of each occurrence.

***

The term 'Occurrence,' wherever used herein, shall mean an unexpected or unintended event, or continuous or repeated exposure to conditions, which unexpectedly or unintentionally, causes injury, damage, or destruction during the policy period."

     The policies issued by Continental which were in effect from 1968 through 1974 insured Maremont for losses over $200,000 and said Continental would:

     "Indemnify the insured for all sums which the Insured shall be obligated to pay by reason of liability *** imposed upon the Insured by law *** for damages, direct or consequential, and expenses, all as defined by the term 'ultimate net loss' *** on account of *** Property Damage, caused by or arising out of each occurrence.

     The term 'Occurrence' means an event or continuous or repeated exposure to conditions, which unexpectedly causes Personal Injury and/or Property Damage and/or Advertising Injury during the policy period."

     The Continental policies covering Maremont from 1974 through 1980 said:

     "[Continental] will indemnify the insured for loss in excess of the total applicable limits of liability of underlying insurance stated in the schedule.  The provisions of the immediate underlying policy are, with respect to Coverage A, incorporated as part of this policy except for any obligation to investigate and defend and pay for costs and expenses incident to any of the same, the amounts of the limits of liability, an 'other insurance' provision, and any other provisions therein which are inconsistent with this policy.

     ***

     Coverage A - This coverage applies to injury or destruction which occurs during this policy period in places stated in the immediate underlying policy: provided that when the immediate underlying policy insures occurrence taking place during its policy period, instead of injury or destruction taking place during the policy period, then this policy applies to occurrences taking place during this policy period."

     These policies insured Maremont for losses in excess of $200,000 until 1976, when the "attachment point" changed to $1,000,000.

London Policies

     Maremont received excess liability coverage under two policies from London from 1962 through 1968.  These policies said London would be liable for the "ultimate net loss of the excess of *** the limits of the underlying insurances *** only up to a further sum of [$1,000,000] in all in respect of each occurrence."

     The policies defined "occurrence" as:

     "[A]n accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damages or advertising liability during the policy period.  All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence." 

     The London policies also said:

     "Subject to the foregoing paragraph and to all other terms and conditions of this policy, in the event that *** property damage arising out of an occurrence covered hereunder is continuing at the time of termination of this Policy the Company will continue to protect the Assured for liability in respect of such *** property damage without payment of additional premium."

     The trial court found the continuing pollution required it to apply a "continuous trigger" in determining coverage for a single occurrence.  Because Maremont could not prove the amount of damages that occurred during the years that Continental and London insured it, the court allocated damages to the various policies in proportion to the period of time each was on the risk.  The trial court further found Maremont was required to horizontally exhaust all primary insurance before it could reach the Continental and London excess policies.  Because the pro rated damages never exceeded the liability amounts of the primary policies, the trial court ruled Continental and London could not be held liable, and granted their motions for summary judgment. 

DECISION

Standard of Review

     Review of the trial court's ruling on a motion for summary judgment is 
de
 
novo
.  
Lajato v. AT&T, Inc.
, 283 Ill. App. 3d 126, 135, 669 N.E.2d 645 (1996).  Summary judgment is proper when the pleadings, depositions, and affidavits on file, construed in the light most favorable to the nonmoving party, establish there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  
Lajato
, 283 Ill. App. 3d at 135.  The purpose of summary judgment is not to decide the facts but to ascertain whether a factual dispute exists.  
Barber-Colman Co. v. A&K Midwest Insulation Co.
, 236 Ill. App. 3d 1065, 1070-71, 603 N.E.2d 1215 (1992).  

Applicable principles of insurance policy construction

The general rules we use to construe insurance contracts are

firmly established.  We use the rules that apply to other kinds of contracts.  
DeFoor v. Northbrook Excess & Surplus Insurance Co.
, 128 Ill. App. 3d 929, 934, 471 N.E.2d 938 (1984).  The

construction of an insurance policy's provisions is a question of

law.  
Outboard Marine Corp. v. Liberty Mutual Insurance Co.
, 154

Ill. 2d 90, 108, 607 N.E.2d 1204 (1992).  

When we construe a policy, our primary task is to ascertain

the intent of the parties to the contract.  To do that, we

construe the policy as a whole, with due regard to the risk

undertaken, the subject matter that is insured, and the purpose

of the entire contract.  
Outboard Marine
, 154 Ill. 2d at 108.   

If the words of the policy are unambiguous, we give them their

plain, ordinary, and popular meaning.  
United States Fidelity &

Guaranty Co. v. Wilkin Insulation Co.
, 144 Ill. 2d 64, 74, 578 N.E.2d 926 (1991).  But if the words in the policy are susceptible to more than one reasonable interpretation, they are ambiguous and will be construed in favor of the insured and against the insurer that drafted the policy.  
Outboard Marine
, 154 Ill. 2d at 108-09.

  
Scope of coverage

Difficulty of proof hovers over this case like a dark cloud.  As we observed in 
Benoy Motor Sales v. Universal Underwriters
,

287 Ill. App. 3d 942, 948, 679 N.E.2d 414 (1997):

"Environmental pollution does not stop and start in discrete time periods.  When pollutants are released or discharged the damage is immediate.  There is a continuing process.  If we were to pour black ink into white milk we could not find a time when the coloring process did not occur."

The policies in this case are third-party, occurrence-based liability policies.  They provide that the insurer will pay "all sums" the insured has to pay because of property damage "caused by or arising out of" (or "growing out of") an occurrence.

These policies anticipate the continuing nature of pollution

damage.  They define "occurrence" as a "continuous or repeated

exposure to conditions, which unexpectedly or unintentionally,

causes injury, damage, or destruction during the policy period."

The policies, then, create a continuing trigger of coverage.  As the continuing process of pollution takes place, a policy

existing at that period of time is triggered. 

We have held that under a continuing trigger analysis property damage will have "occurred" continuously for a fixed period " *** and every insurer on the risk at any time during the trigger period is jointly and severally liable to the extent of their policy limits."  
United States Gypsum Co. v. Admiral Insurance Co.
, 268 Ill. App. 3d 598, 644, 643 N.E.2d 1226 (1991).

U.S. Gypsum
 applied the reasoning of 
Zurich Insurance Co. v. Raymark Industries Inc.
, 118 Ill. 2d 23, 514 N.E.2d 150 (1987).  
Zurich
 dealt with bodily injury incurred by people who inhaled asbestos fibers. The supreme court said:

"'Bodily injury' takes place at or shortly after the time a claimant was exposed to asbestos and continues throughout a claimant's exposure to asbestos.  Thus, an insurer that was on the risk during the time the claimant was exposed to asbestos must provide coverage."  
Zurich
, 118 Ill. 2d at 47.

We conclude Maremont is correct when it says the phrase

"during the policy period" contained in the various "occurrence"

definitions defines what has to happen to trigger the policies

and is not a limitation on the insurance companies' promises to

pay "all sums."     

In support of our conclusion we note the London policies

provide that "property damage arising out of an occurrence

covered hereunder is continuing at the time of the termination of

this Policy and the Company will continue to protect the Assured

for liability in respect of such *** property damage without

payment of additional premium."

Our conclusion best reflects the contract entered into by 

the parties.  That is, "during the policy period" is not a

limitation on the scope of coverage. 

Outcome determinative questions remain. 

Allocation of policy coverage

Maremont dumped and spilled off and on at the various

locations for more than 40 years.  In the trial court Maremont

made no effort to establish when a dump or spill took place with

relation to a particular policy at a specific site.  The insurance companies quite rightly complain that Maremont seeks to require reimbursement for acts which might have taken place after a policy period expired.  How, then, the insurers ask, can a court determine how much property damage took place during any discrete period of time? 

Maremont contends that doesn't matter at this point in the

proceedings.  Maremont contends that once any one of its triggered excess policies is reached, that policy has to pay out up to its limits.  The trial court did not agree with Maremont, holding with the insurance companies that they can be responsible only for a proportionate share of damages based on the years their policies insured Maremont.  That is, a 
pro
 
rata
, time-on-the-risk allocation.

The insurers rely on 
Outboard Marine Corp. v. Liberty Mutual

Insurance Co.
, 283 Ill. App. 3d 630, 670 N.E.2d 740 (1996) and

later decisions grounded in Outboard Marine.  See 
Roman Catholic 

Diocese v. Lee
, 292 Ill. App. 3d 447, 685 N.E.2d 932 (1997) (
pro

rata
 allocation is the only way to measure amount of damage

caused by sexual molestations during a given policy period); 

Missouri Pacific Railroad Company
, 288 Ill. App. 3d 69, 679 N.E.2d 801 (1997) (If noise-induced hearing loss cannot be measured and allocated to particular policy periods, a 
pro
 
rata
,

time-on-the-risk allocation of damages should be used.)  See also 
Illinois Central Railroad Co. v. Accident and Casualty Co.
, 317 Ill. App. 3d 737, 739 N.E.2d 1049 (2000) (Where claimants could not prove when injury from separate acts of hiring discrimination occurred, damages were properly allocated to the policy in effect when the employment application was made).

Outboard Marine
 is the only Illinois case that decides how 

damages are to be apportioned among insurers in an environmental 

pollution coverage case.  The court held with 
U.S. Gypsum
 on the

application of a continuous trigger, single occurrence theory.  Then it held "the trial court correctly concluded that a 
pro

rata
, time-on-the risk allocation of damages should be applied"

for periods of 
Outboard Marine
's no insurance or self-insurance.  While 
Outboard Marine
 seems to rely at least in part on 
U.S. Gypsum
 for its 
pro
 
rata
 allocation holding, we note that specific

issue was not before the 
U.S. Gypsum
 court.

Maremont contends 
Outboard Marine
 and the decisions that

follow it run afoul of 
Zurich
.  In 
Zurich
, the supreme court

rejected a 
pro
 
rata
 allocation of defense and indemnity

obligations among policies triggered by a claimant's exposure to

asbestos during a policy period.  The court did not see anything in the policy language that permitted proration.  
Zurich
, 118 Ill. 2d at 57.  The 
Zurich
 court did not have to contend with the murkiness of proof that marks this and other environmental pollution cases.

Whether 
Zurich
's no 
pro
 
rata
 holding applies to the kind of

case before us is an issue that awaits another day. 

Vertical vs. horizontal exhaustion
 

The question that drives this case is when, if ever,

Continental's or London's excess policies were reached.  The trial judge, when granting summary judgment, ruled Maremont 

must exhaust all available primary insurance, including the 

periods it was uninsured or self-insured, before the excess 

policies could come into play.  The trial judge was describing

horizontal exhaustion.   

Maremont argues for vertical exhaustion, saying the express

language of the policies provides coverage in excess of a

specific, scheduled underlying policy in a given policy year.

The issue was resolved in 
U.S. Gypsum
, and then in 
Outboard

Marine
, 
Roman Catholic Diocese
, 
Missouri Pacific RR
, and 
Illinois 

Central Railroad
.  In those cases, as here, the insurance policies contained "other insurance" clauses.  Each case held the insured must first exhaust all available primary insurance coverage, including uninsured periods and self-insured periods, before an excess policy could be reached.

Supportive reasoning was supplied by 
U.S. Gypsum
:

"Adopting Gypsum's position permitting 'vertical exhaustion' would allow Gypsum to effectively manipulate the source of its recovery, avoiding difficulties encountered as a result of its purchase of fronting insurance and the liquidation of some of its insurers.  This would permit Gypsum to pursue coverage from certain excess insurers at the exclusion of others.  Such a practice would blur the distinction between primary and excess insurance [cite] and would allow certain primary insurers to escape unscathed when they would otherwise bear the initial burden of providing indemnification.  Likewise, certain co-excess

insurers could avoid contributing to the indemnification of the insured when they would otherwise be responsible for any amount up to the limit of the policy it issued.  [Cite]." 
U.S. Gypsum
, 268 Ill. App. 3d at 598.

No Illinois case speaks in favor of the vertical exhaustion

theory urged on us by Maremont.  
U.S. Gypsum
 specifically rejects

the notion that exhaustion of a specific, scheduled primary

policy is sufficient to reach the excess policy containing that

schedule.

Maremont provided no evidence in the trial court to establish how much property damage occurred at the six sites during specific policy years.  It had ample opportunity to do so, if it could.  We note the record before us consists of 70 volumes

developed over a period of 7 years of litigation.

When Continental and London moved for summary judgment, Maremont was not required to establish its case as it would at trial, but it had to present some factual basis that would arguably entitle it to judgment.  
West v. John Deere & Co.
, 145 Ill. 2d 177, 182, 582 N.E.2d 685 (1991).  Failure to provide the trial court with sufficient facts to support the claim that an excess policy was reached was a fatal omission.

Maremont's failure to create a factual claim that exhaustion

of all of its available primary insurance allows it to seek

excess coverage defeats its case.  The trial judge correctly

entered summary judgment on behalf of Continental and London.

CONCLUSION

For the reasons stated, we affirm the trial court's grant of

summary judgment on behalf of the defendant insurers.

Affirmed.

HALL, P.J., and SOUTH, J., concur.