In the
United States Court of Appeals
For the Seventh Circuit

No. 01-2855

FIRST INSURANCE FUNDING CORPORATION,

Plaintiff-Appellant,

v.

FEDERAL INSURANCE COMPANY,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 8135--John W. Darrah, Judge.

ARGUED FEBRUARY 20, 2002--DECIDED MARCH 28, 2002

   Before BAUER, RIPPLE and MANION, Circuit
Judges.

   RIPPLE, Circuit Judge.  Defrauded of over
$4.3 million, First Insurance Funding
Corporation ("First Insurance") sought
indemnification for these losses under
the terms of a financial institution bond
that its parent corporation had purchased
from Federal Insurance Co. ("Federal").
When Federal denied the claim for
coverage, First Insurance filed this
action seeking a declaratory judgment of
Federal's obligation to indemnify for
these losses. In addition, First
Insurance alleged that Federal's actions
constituted not only a breach of contract
but also an unreasonable and vexatious
denial of coverage in violation of the
Illinois Insurance Code. Upon Federal's
motion, the district court dismissed the
complaint concluding that the bond did
not cover the losses for which First
Insurance sought indemnification. In the
district court's determination, this
ruling also foreclosed First Insurance's
claim against Federal under the Illinois
Insurance Code. For the reasons set forth
in the following opinion, we affirm the
judgment of the district court.

I

BACKGROUND

## A.  Facts

Operating from Northbrook, Illinois, First Insurance serves as an insurance premium finance company. In this role, it provides loans to businesses that seek to finance the payment of their annual insurance premiums. Typically, these businesses obtain financing from First Insurance through an independent insurance broker. More precisely, a business seeking insurance coverage hires an independent insurance broker for a dual purpose; the broker not only procures insurance coverage for the business but also obtains the necessary financing for this purchase from an insurance premium finance company such as First Insurance.

If the broker and its business client select First Insurance to finance the transaction, the parties document the loan through a standardized finance agreement. To expedite the loan application process, First Insurance provides brokers with blank premium finance agreements as well as related computer software. Using this material, the broker assists its business client in filling out the loan agreement. Once the broker and client complete and sign the finance agreement, they forward the document to First Insurance which then must review and approve the application. Once First Insurance approves the loan, it disburses the loan amount to the broker who, in turn, pays the insurance premium on behalf of its client.

Beginning in 1996, First Insurance provided funding for a significant volume of legitimate premium finance loans for clients of Colesons Insurance Group ("Colesons")--an independent insurance broker. Colesons had received authorization from First Insurance to select it from among vendors offering premium financing to Colesons' business clients. In submitting its clients' loan applications, Colesons used the blank premium finance agreements and related software provided by First Insurance. Based on these legitimate transactions, Colesons developed a reputation with First Insurance for trustworthy business dealings.

However, at some time prior to August

2000, certain individuals associated with Colesons began submitting fraudulently altered premium finance agreements to First Insurance. Specifically, these documents bore forged signatures of Colesons' clients that purportedly sought premium finance loans from First Insurance. The fraudulently altered documents shared certain similarities. Each premium finance agreement bore Colesons' warranty that the client's signature was genuine. In addition, when preparing the altered documents, the forgers used the software program that First Insurance had provided Colesons. In reliance on these forged and fraudulently altered documents, First Insurance disbursed over $4.3 million to Colesons.

Upon discovering the fraudulent transactions, First Insurance promptly sought indemnification for its losses under the terms of a financial institution bond that its parent corporation had purchased from Federal. This bond, which served as an insurance policy, provided coverage against losses resulting from certain fraudulent or dishonest conduct perpetrated against First Insurance. Citing, among other reasons, Exclusion 3.m of the bond, Federal denied the request for indemnification. Exclusion 3.m provides that:

This bond does not directly or indirectly cover . . . loss caused by any agent, broker, factor, commission merchant, independent contractor, intermediary, finder or other representative of the same general character of the ASSURED.

R.12, Ex.A. Federal reasoned that Colesons served as an intermediary, finder or other representative of First Insurance. As such, in Federal's estimation, the terms of the bond did not cover the losses for which First Insurance sought indemnification.

B.  District Court Proceedings

1.

On December 29, 2000, First Insurance, invoking the diversity jurisdiction of the district court,/1 commenced this multi-count action against Federal. In particular, the complaint sought a declaratory judgment that the terms of

the bond required Federal to indemnify First Insurance for the losses it sustained as a result of the forgery scheme. First Insurance also alleged that Federal's failure to indemnify constituted not only a breach of contract but also an unreasonable and vexatious denial of coverage in violation of Section 155 of the Illinois Insurance Code.

Federal promptly moved to dismiss the complaint. Specifically, the insurer submitted that Colesons was an intermediary, finder or similar representative of First Insurance thereby implicating Exclusion 3.m of the bond. Thus, in Federal's estimation, the bond did not cover the losses for which First Insurance sought indemnification. Moreover, absent a valid claim for coverage, Federal reasoned that First Insurance could not maintain a cause of action under the Illinois Insurance Code.

2.

After reviewing the pleadings, the district court dismissed First Insurance's complaint. Finding the terms of the contract unambiguous, the district court concluded that the bond excluded from coverage the losses for which First Insurance sought indemnification. In the district court's estimation, Colesons functioned as an intermediary or finder of First Insurance thereby implicating Exclusion 3.m of the bond. Because this provision barred from coverage losses caused by an intermediary or finder, First Insurance could not state a valid claim for coverage under the bond. According to the district court, this determination also foreclosed First Insurance's claim under Section 155 of the Illinois Insurance Code. Relying on Illinois law, the court concluded that an insured must have a legitimate claim for coverage before it may maintain an action against an insurer under this statutory provision. First Insurance's complaint was dismissed with leave to amend its allegations.

Availing itself of this opportunity, First Insurance submitted an amended complaint to the district court./2 The district court, however, concluded that First Insurance had failed to allege any new allegations and had merely

recapitulated its previous pleading. Moreover, the district court expanded its previous ruling, noting that, even if Colesons had not functioned as an intermediary or finder, the insurance broker certainly served First Insurance as a representative of the same general character. Once again concluding that Exclusion 3.m defeated First Insurance's request for indemnification, the district court again dismissed the complaint with leave to amend. First Insurance, however, failed to amend the complaint./3

II

DISCUSSION

We review the district court's grant of a motion to dismiss de novo. See Tobin for Governor v. Ill. State Bd. of Elections, 268 F.3d 517, 521 (7th Cir. 2001). We not only accept as true all of the well-pleaded factual allegations in the plaintiff's complaint but also draw all reasonable inferences in the plaintiff's favor. See id. We, however, need not accept as true "conclusory statements of law or unsupported conclusions of fact." McLeod v. Arrow Marine Transp., Inc., 258 F.3d 608, 614 (7th Cir. 2001). After reviewing the plaintiff's pleadings under these rules, if it appears beyond doubt that the plaintiff cannot prove any set of facts that would entitle it to relief, then we shall affirm the district court's dismissal of the complaint. See Tobin for Governor, 268 F.3d at 521.

A.

1.

Before turning to the provisions of the bond, we set forth the principles that will guide our inquiry. Interpretation of an unambiguous contract--including insurance policies-- poses a question of law. See Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp., 270 F.3d 1117, 1123 (7th Cir. 2001). Under Illinois law,/4 when interpreting an insurance agreement, the court's primary function is to ascertain and give effect to the true intentions of the contracting parties. See Fid. & Cas. Co. v. Merridew, 762 N.E.2d 570, 574 (Ill. App. Ct. 2001). In doing so, we must consider the agreement as a whole, "with due regard to the risk

undertaken, the subject matter that is insured, and the purpose of the entire contract." Maremont Corp. v. Cont'l Cas. Co., 760 N.E.2d 550, 554 (Ill. App. Ct. 2001). Absent some contrary indication from the terms of the agreement, undefined and unambiguous terms are assigned their plain and ordinary meaning. See Benedict v. Fed. Kemper Life Assurance Co., 759 N.E.2d 23, 27 (Ill. App. Ct. 2001). If the terms of the policy are unambiguous, we give effect to the agreement as written. See id. Although the court liberally interprets in favor of the insured provisions that limit or exclude coverage, it may not read an ambiguity into a policy to provide coverage for the insured. See Fid. & Cas. Co., 762 N.E.2d at 574. Rather, an ambiguity exists only if the insurance policy is susceptible to reasonable alternate interpretations. See Maremont Corp., 760 N.E.2d at 554. Any such ambiguities will be "construed in favor of the insured and against the insurer that drafted the policy." Id.

2.

We now address the parties' contentions concerning the effect of Exclusion 3.m on First Insurance's claim for indemnification. This provision of the bond provides:

This bond does not directly or indirectly cover . . . loss caused by any agent, broker, factor, commission merchant, independent contractor, intermediary, finder or other representative of the same general character of the ASSURED.

R.12, Ex.A. The district court concluded that this provision unambiguously barred First Insurance from recovering, under the terms of the bond, the losses resulting from the forgery scheme perpetrated against it. First Insurance, however, submits that, during the fraudulent transactions, Colesons acted solely on its own behalf, and thus could not have served as an intermediary, finder or other representative of First Insurance thereby rendering Exclusion 3.m inapplicable to the request for indemnification. Moreover, relying on an unsupported and conclusory statement in its pleadings, First Insurance alleges that it never employed Colesons at any time to serve as an intermediary, finder

or similar representative. Federal's position on appeal largely tracks the rationale of the district court's opinion.

Because the bond does not define the terms "intermediary", "finder", or "other representative of the same general character", we must assign these words their plain and ordinary meaning. Generally, an intermediary acts as a middleman, "a broker, one who is employed to negotiate a matter between two parties, and who for that purpose may be [an] agent of both." Black's Law Dictionary 731 (5th ed. 1979). Likewise, Illinois courts have defined a finder relationship as "an arrangement by which an intermediary finds, introduces, and brings together parties to a business opportunity, leaving the ultimate negotiation and consummation of the business transaction to the principals." Ruskin v. Rodgers, 399 N.E.2d 623, 637 (Ill. App. Ct. 1979) (quoting 24 A.L.R.3d 1164). Although the final phrase "other representative of the same general character" lacks a precise definition, the import of these words is clear. The parties designed the phrase as a catchall--excluding from coverage losses caused by entities that, although failing to fit the technical definition of an intermediary or finder, functioned essentially in that same general capacity.

Although Illinois law instructs us to construe liberally in favor of the insured provisions that exclude coverage, the terms of Exclusion 3.m are unequivocal: the bond does not cover losses caused by an intermediary, finder or other similar representative of First Insurance. In its brief to this court, First Insurance, relying on a conclusory statement from its pleadings, submitted that it never employed Colesons to act as its intermediary, finder or similar representative. However, at oral argument, when asked directly to characterize the relationship between First Insurance and Colesons with regard to the legitimate transactions, counsel for First Insurance conceded that Colesons functioned as an intermediary of the premium finance company. Even absent this concession, it is evident from the pleadings that First Insurance enjoyed a special relationship with Colesons. First

Insurance not only authorized Colesons to select it from among vendors offering premium financing to Colesons' business clients but also provided Colesons with blank finance agreements and related computer software. Colesons then used the documents and software to obtain for its clients premium financing from First Insurance. This activity is the precise type of conduct in which an intermediary, finder or other representative engages-- bringing businesses together to consummate a transaction. Based on the pleadings and counsel's concession at oral argument, we conclude that Colesons served as First Insurance's intermediary, finder or other representative of the same general character.

Although this determination seemingly would preclude First Insurance from recovering its losses under the terms of the bond, it also has submitted that Colesons could not have functioned as an intermediary or finder during the fraudulent transactions. Intermediaries or finders bring two or more parties together for the purpose of conducting business. Because Colesons brought First Insurance together with a fictitious party during the fraudulent transactions, First Insurance posits that Colesons could not have functioned as finder or intermediary during the course of the forgery scheme thereby removing the claim for indemnification from the ambit of Exclusion 3.m.

We cannot accept this contention. The bond places squarely on First Insurance the risk associated with dishonest or fraudulent conduct perpetrated against it by a certain class of entities. In unequivocal terms, Exclusion 3.m states that First Insurance, rather than Federal, must bear losses caused by, among others, First Insurance's agents, intermediaries, finders or other representatives of the same general character. In this case, First Insurance cloaked Colesons with the authority to act as its intermediary, finder or other representative of the same general character. During the fraudulent transactions, First Insurance dealt with Colesons under the apprehension that Colesons was acting in such a capacity. It relied on Colesons' status as its intermediary in approving the loans to the fictitious customers and disbursing

the funds to this independent insurance broker. Although employees of Colesons abused their employer's status as an intermediary or finder, this factor does not permit First Insurance to escape the plain implications of the exclusion clause. Under the terms of the bond, First Insurance bore the risk of cloaking Colesons with the authority to act as its intermediary, finder or other representative of the same general character. Federal did not agree to indemnify First Insurance for such losses. Accordingly, we conclude that Federal properly denied under Exclusion 3.m First Insurance's request for indemnification./5

B.

Finally, we turn to First Insurance's contention that Federal unreasonably and vexatiously denied its request for indemnification thereby creating a cause of action against Federal under Section 155 of the Illinois Insurance Code. Section 155 provides

In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, [and] other costs.

215 ILCS 5/155(1). The Illinois legislature designed this provision to provide a remedy to "insureds who encounter unnecessary difficulties resulting from an insurance company's unreasonable and vexatious refusal to honor its contract with the insured." Korte Constr. Corp. v. Am. States Ins., 750 N.E.2d 764, 771 (Ill. App. Ct. 2001). However, when an insurer denies the claim of an insured because no coverage exists, the insurer has not failed to honor its contractual obligations under an insurance policy. As such, Illinois courts allow a cause of action to proceed under Section 155 only if the insurer owed the insured benefits under the terms of the policy. See Armando v. State Farm Mut. Auto. Ins. Co., 751 N.E.2d 582, 586

(Ill. App. Ct. 2001) ("Furthermore, because there is no coverage under the State Farm policy, we find that State Farm did not act vexatiously or unreasonably in handling plaintiff's claim."); Martin v. Ill. Farmers Ins., 742 N.E.2d 848, 857 (Ill. App. Ct. 2000) ("A[n] [insurer] cannot be liable for section 155 relief where no benefits are owed."). See also Prisco Serena Sturm Architects, Ltd. v. Liberty Mut. Ins. Co., 126 F.3d 886, 894 (7th Cir. 1997) (construing Section 155 of the Illinois Insurance Code). In this case, we have concluded that Federal had no obligation to indemnify First Insurance for the losses it suffered as a result of the forgery scheme. Pursuant to Illinois law, absent a legitimate claim for coverage under the terms of the bond, First Federal may not seek relief under Section 155. As such, we conclude that the district court properly dismissed this portion of First Insurance's complaint.

Conclusion

We conclude that the district court correctly dismissed First Insurance's complaint. Accordingly, the judgment of the district court is affirmed.

AFFIRMED

FOOTNOTES

/1 First Insurance is an Illinois corporation with its principal place of business in Northbrook, Illinois. Federal is incorporated in Indiana with its principal place of business in Warren, New Jersey. The amount in controversy exceeds $75,000.

/2 In the most conclusory fashion, First Insurance pleaded in its amended complaint that the "exclusion contains one or more ambiguities that must be resolved in favor of coverage." R.12, para. 18.b. In a similar manner, First Insurance stated that it "never engaged, employed or contracted with Colesons to act as its 'finder,' 'intermediary,' or other representative for the purpose of generating premium finance business." R.12, para. 18.c.

/3 We note that the district court never entered a final judgment as required by Fed. R. Civ. P. 58. We have criticized in the past the practice followed here. Nevertheless, because it is clear that the district court intended to terminate the litigation, we may exercise appellate jurisdic-

tion. See Otis v. City of Chicago, 29 F.3d 1159, 1164 (7th Cir. 1994) (en banc); Eberhardt v. O'Malley, 17 F.3d 1023, 1024 (7th Cir. 1994).

/4 The parties agree that Illinois law governs construction of the terms of the bond.

/5 Because we believe that Federal must prevail on the basis of Exclusion 3.m, we need not address its alternative arguments for affirmance.