GENERAL AGENTS INSURANCE COMPANY OF AMERICA, INC., Plaintiff-Appellee, v. MIDWEST SPORTING GOODS COMPANY *et al.*, Defendants-Appellants.

First District (1st Division)   No. 1—01—1519

Opinion filed March 4, 2002.

Lora E. Minichillo and Kenneth H. Denberg, both of Michael Best & Friedrich, L.L.C., of Chicago, for appellant Midwest Sporting Goods Company.

Patrick M. Graber and Bart Rinn, both of McCullough, Campbell & Lane, of Chicago, for appellee.

JUSTICE McNULTY delivered the opinion of the court:

The City of Chicago and Cook County sued a number of gun manufacturers and distributors, including Midwest Sporting Goods, for negligently entrusting guns to inappropriate purchasers and thereby creating a public nuisance. Midwest tendered defense of the lawsuit to its liability insurer, General Agents Insurance Company of America (Gainsco). Gainsco filed this action seeking a judgment declaring that it had no duty to defend or indemnify Midwest. The trial court granted summary judgment in favor of Gainsco and Midwest appeals. We hold that the pattern of sales practices the plaintiffs will need to prove for recovery cannot qualify as an accident within the meaning of the policy. Accordingly, we affirm the judgment of the trial court.

The city and the county alleged in the complaint that during 1998 undercover police officers went to Midwest's store in Cook County to test the measures Midwest took to prevent guns from getting into criminal hands. One officer purchased a Uzi. According to the complaint:

> "The sales clerk said that since they could not legally deliver the Uzi to him in Cook County, they would have to write up the purchase order on the forms of the Midwest Sporting Goods' Downers Grove store, and he would have to pick up the firearm at the Downers Grove store. The sales clerk used a blank purchase order with the Downers Grove masthead, and he called the Downers Grove store and asked them to call in his FOID [firearm owners identification card] number. When Officer 1 said that he wanted to purchase a pistol barrel for the Uzi, the sales clerk told him that since it was illegal to put the pistol barrel on the Uzi, he should write up the pistol barrel as a separate purchase from Midwest's Lyons store (the one he was in at the time) rather than the Downers Grove store from which he was technically buying the Uzi. The sales clerk also advised Officer 1 that he should have all of the purchases written up on separate orders so as to avoid ATF [United States Bureau of Alcohol Tobacco and Firearms] scrutiny."

When the officer picked up the Uzi in Downers Grove, a Midwest employee advised him "to put the Uzi in his trunk, because he would be arrested if caught with it in Cook County." The same officer purchased six other guns at Midwest between September 30 and October 24, 1998. He picked up all seven guns between October 19 and November 5, 1998.

A second undercover officer asked a Midwest sales clerk to help

her find a concealable but powerful gun to keep at her Chicago address. The clerk told her it was illegal to carry a handgun in Chicago and that 90% of the store's customers came from Chicago. The officer chose two guns. The clerk advised her to order the firearms separately, and pick them up separately, so that the store would not need to inform ATF of a multiple purchase.

That same officer on another occasion purchased a gun for another undercover officer, who accompanied her to the store and paid the clerk for the gun. Midwest's sales clerk did not ask for the paying officer's identification and registered the sale to the nonpaying officer's FOID number.

The complaint explained that "straw" purchases, by one person for the benefit of another (who usually cannot legally purchase a firearm), contribute disproportionately to crime. An officer observed customers unaffiliated with the police make such a straw purchase from Midwest.

The city and the county further allege that Midwest sells guns to Chicago residents who indicate that they will use or possess the guns in violation of Chicago ordinances. Midwest sells guns even to customers who show that they intend to transfer the guns, illegally, to other persons. From data Midwest receives from ATF, Midwest knows that multiple sales of firearms and sales to Chicago residents create a substantially greater likelihood of criminal use and possession of the firearms sold.

According to the complaint, Midwest "intentionally and recklessly facilitates the illegal possession and use of firearms" with the advice it gives to Chicago customers and customers purchasing more than one gun. Midwest and the other gun dealers "know that many of the firearms they sell *** will be obtained by persons who will use *** their firearms illegally." The multiple sales to straw purchasers from Chicago "unreasonably facilitate violations of City ordinances, and contribute to physical harm *** to Chicago residents."

The city and the county seek injunctions and damages, including costs of emergency medical services and the "Bureau of Health's costs to treat victims of firearms violence," estimated to exceed $50 million for the period from 1994 through 1998.

Gainsco agreed to defend Midwest against any claim for bodily injury caused by an occurrence in the policy period. An "occurrence" is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The policy also included an expected or intended injury exclusion, which states:

> "This insurance does not apply to and no duty to defend is provided by us for 'bodily injury' or 'property damage' arising from

an intentional act whether or not the resultant 'bodily injury' or 'property damage' was intended or expected from the standpoint of the insured."

After Midwest filed its answer to the complaint for declaratory judgment, Gainsco moved for summary judgment. Gainsco argued that the complaint did not allege an occurrence, within the meaning of the policy, and the expected or intended injury exclusion precluded coverage. Midwest answered that the city's complaint alleged occurrences in both the public nuisance and the negligent entrustment counts. The trial court granted summary judgment in favor of Gainsco.

## ANALYSIS

■ ■ We review the judgment *de novo*. *Murneigh v. Gainer*, 177 Ill. 2d 287, 298, 685 N.E.2d 1357 (1997). Our supreme court has restated the principles applicable for deciding the extent of a liability insurer's duties to its insured:

"To determine an insurer's duty to defend its insured, the court must look to the allegations of the underlying complaints. If the underlying complaints allege facts within or potentially within policy coverage, the insurer is obliged to defend its insured even if the allegations are groundless, false, or fraudulent. [Citation.] An insurer may not justifiably refuse to defend an action against its insured unless it is clear from the face of the underlying complaints that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage. [Citation.] Moreover, if the underlying complaints allege several theories of recovery against the insured, the duty to defend arises even if only one such theory is within the potential coverage of the policy. [Citation.]

The underlying complaints and the insurance policies must be liberally construed in favor of the insured. *** All doubts and ambiguities must be resolved in favor of the insured." (Emphasis omitted.) *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64, 73-74, 578 N.E.2d 926 (1991).

The policy purports to exclude coverage for any injury arising from an intentional act, regardless of whether the insured intended or expected the injury. This clause, read expansively in favor of the insurer, would nullify coverage for almost all negligent acts.

"[V]irtually all tortfeasors who embark upon a course of conduct act 'intentionally' in some measure. (For example, a child who accidentally hits a baseball through a neighbor's window 'intended' to hit the baseball, but did not intend to break the window.) ***
* * *
*** If the exclusionary clause denied coverage for negligent or in-

nocent acts as well, the clause would contradict and swallow the entire personal liability policy. Whenever possible, courts should construe a contract so that different provisions are harmonized and not conflicting with one another." *Lincoln Logan Mutual Insurance Co. v. Fornshell*, 309 Ill. App. 3d 479, 483-84, 722 N.E.2d 239 (1999).

■ The court in *Lincoln Logan* concluded that the exclusion applied only to intentional acts where the insured specifically intended to harm someone. *Lincoln Logan*, 309 Ill. App. 3d at 483. The complaint here does not allege that Midwest specifically intended to kill or injure anyone. Following *Lincoln Logan*, we hold that the exclusion in Gainsco's policy does not preclude coverage.

■ But the policy also restricts coverage to accidents. The policy here does not define the term "accident." In construing similar policies, Illinois courts have clarified that an event counts as an accident only if it is

> "an unforseen occurrence, usually of an untoward or disastrous character or an undesigned sudden or unexpected event of an inflictive or unfortunate character. The natural and ordinary consequences of an act do not constitute an accident." *Aetna Casualty & Surety Co. v. Freyer*, 89 Ill. App. 3d 617, 619, 411 N.E.2d 1157 (1980).

In *City of Carter Lake v. Aetna Casualty & Surety Co.*, 604 F.2d 1052 (8th Cir. 1979), the court suggests that for interpreting the word "accident" in a general liability policy, courts should treat the issue as

> "a matter of probability. *** If the insured knew or should have known that there was a substantial probability that certain results would follow his acts or omissions then there has not been an occurrence or accident as defined in this type of policy when such results actually come to pass. The results cease to be expected and coverage is present as the probability that the consequences will follow decreases and becomes less than a substantial probability." *Carter Lake*, 604 F.2d at 1058-59.

As the court explained in a footnote:

> "The difference between 'reasonably foreseeable' and 'substantial probability' is the degree of expectability. A result is reasonably foreseeable if there are indications which would lead a reasonably prudent man to know that the particular results could follow from his acts. Substantial probability is more than this. The indications must be strong enough to alert a reasonably prudent man not only to the possibility of the results occurring but the indications also must be sufficient to forewarn him that the results are highly likely to occur." *Carter Lake*, 604 F.2d at 1059 n.4.

We agree with *Carter Lake*'s interpretation of the term "accident" in general liability policies. The issue before this court, then, is

whether the complaint alleges facts under which Midwest might be liable for injuries which were, from Midwest's perspective, not highly likely to occur. The complaint pleads two basic theories, negligent entrustment and public nuisance. Midwest argues that both counts plead accidents within the meaning of the policy.

## NEGLIGENT ENTRUSTMENT

■ To establish a claim for negligent entrustment, the plaintiff must show that the defendant entrusted a dangerous article to another when the defendant knew, or should have known, he was likely to use it in a manner involving an unreasonable risk of harm to others. *Barth v. Massa*, 201 Ill. App. 3d 19, 27, 558 N.E.2d 528 (1990). The plaintiff need not prove that the defendant knew of specific individual propensities for harm; a lawsuit may succeed with proof that the defendant entrusted the dangerous article to a member of a larger class, where the defendant knew or should have known that members of the larger class generally tended to use such articles in a manner involving unreasonable risk of harm. *Semeniuk v. Chentis*, 1 Ill. App. 2d 508, 512, 117 N.E.2d 883 (1954); *Moving v. Alfonso*, 400 Mich. 425, 444 n.18, 254 N.W.2d 759, 767 n.18 (1977); Restatement (Second) of Torts §.390, Comment *b* (1965).

■ Courts have held retailers liable for negligently entrusting dangerous articles to irresponsible purchasers. *Semeniuk*, 1 Ill. App. 2d at 512-14; *Salvi v. Montgomery Ward & Co.*, 140 Ill. App. 3d 896, 910-11, 489 N.E.2d 394 (1986); *Small v. St. Francis Hospital*, 220 Ill. App. 3d 537, 541-42, 581 N.E.2d 154 (1991). As the danger of the guns Midwest sells is incontestable, plaintiffs' success on this count hinges on proof that Midwest knew, or should have known, that some of the persons to whom it sold guns were likely to use them in ways involving unreasonable risk of harm to others.

Plaintiffs describe several specific sales in the complaint, and they ask the court to infer that Midwest generally gave similar advice and used similar procedures in its gun sales. Significantly, plaintiffs do not allege that any of Midwest's sales detailed in the complaint led to any damages whatsoever. Because undercover police officers purchased almost all of the guns in the sales so specified, we presume that the guns did not enter the secondary underground market for guns and they never fell into the grasp of persons likely to use the guns to harm others. Because no individual sale described in the complaint can support any recovery by plaintiffs, the count depends on proof of ongoing use of general sales practices.

But the pattern itself takes the allegations out of the realm of accident. In *Carter Lake*, sewage backed up into the home of the

plaintiffs in the underlying lawsuit. They immediately informed the city of the problem, and the city discovered that their pump shut off when it overloaded, causing the sewage to back up. The city did nothing to correct the problem, and sewage backed up into the same home five months after the first occurrence, and four more times in the following six months. *Carter Lake*, 604 F.2d at 1055.

Aetna denied coverage. The court held:

> "After the first backup, the probability of an identical equipment failure and consequential flooding of the [plaintiffs'] basement on a particular day was relatively slight, about 2% with hindsight. However, there was clearly a substantial probability of another backup at some time caused by an identical equipment failure if the equipment was not replaced or an alarm system installed. Nevertheless, Carter Lake took the calculated risk that such backup would not occur, and elected to continue operations without correcting its methods. Once the city was alerted to the problem, its cause, and the likelihood of reoccurrence, it could not ignore the problem and then look to Aetna to reimburse it for the liability incurred by reason of such inaction. [Citations.] Accordingly, the floodings subsequent to the [first] incident were not unexpected and thus were not accidents or occurrences as those terms were used in the insurance policy." *Carter Lake*, 604 F.2d at 1059.

■ Here, the complaint alleges that Midwest knew, at least from ATF reports, that substantial numbers of guns it sold found their way to an illegal resale market and into the hands of criminals. Midwest also knew that its advice to Chicago customers about methods of evading police detection when bringing guns into the city, and methods for avoiding the reporting requirements of the ATF, helped increase the supply of guns for the illegal secondary sales market. After obtaining reports of deaths its sales caused, Midwest did nothing to change its sales practices. Although the probability of eventual criminal misuse of any individual firearm sold to such a purchaser may be small enough for the foreseeable injury to qualify as an accident, Midwest knew that its sales practices would cause bodily injury and death in Chicago.

*Calvet Insurance Co. v. Western Insurance Co.*, 874 F.2d 396 (7th Cir. 1989), presents an analogous situation. In that case the plaintiff in the underlying suit alleged that police officers for the defendant city used excessive force when arresting the plaintiff. The plaintiff alleged that the city had notice of the continuing course of similar incidents, and through a course of deliberate indifference to the injuries so caused, acquiesced in the repeated police misconduct. The trial court held that the city's liability insurer had no duty to defend the city because, according to the complaint, the city acted

> "with complete indifference to a known significant risk of harm.

[Citations.] *** Thus, where a City recklessly fails to train or supervise its officers and where it recklessly fails to act even though it is aware of a series of civil rights violations against its citizens, the City 'expects' that injuries such as those suffered by [the plaintiff in the underlying suit] will occur." *Calvet Insurance*, 874 F.2d at 401.

Midwest, under the allegations of the complaint, acted with complete indifference to the known significant risk of deaths and injuries resulting from its gun sales. Even after reports from the ATF showed the danger inherent in its sales practices, Midwest took no steps to deter multiple sales of guns to straw purchasers from Chicago. Through its sales clerks Midwest continued to encourage such sales by advising customers of ways to avoid ATF reporting requirements and police detection in Chicago. This pattern and practice of entrusting guns to persons in a group with a known propensity to introduce the guns to the illegal secondary market, whence the guns reach the hands of persons inclined to use them in ways involving a known, great, and very unreasonable risk of harm to others, cannot qualify as accidental. Under the reasoning of *Carter Lake* and *Calvet Insurance*, the policy here provides no possible coverage for the negligent entrustment alleged.

## PUBLIC NUISANCE

This court's decision in *Young v. Bryco Arms*, 327 Ill. App. 3d 948 (2001), delineates the allegations essential for recovery against gun distributors based on a theory of public nuisance. In that case the plaintiff alleged that a gun retailer created a public nuisance that led to the murder of plaintiff's decedent. The trial court held that the complaint stated a viable cause of action, and we affirmed. We distinguished several cases from other jurisdictions in which the courts dismissed public nuisance claims against firearms manufacturers and distributors:

"There appears to be a correlation between the degree of mental culpability associated with a defendant's (manufacturer, distributor or dealer) alleged conduct and whether a public nuisance claim is permitted to proceed. In these cases, allegations falling short of intentional creation and propagation of an illegal underground gun market, such as negligence, recklessness, awareness or knowledge that guns flow into an illegal market, have not succeeded.

* * *

In the instant case, the complaints are filed on behalf of persons who were killed by teenage gang members. Plaintiffs have alleged that defendants *intentionally* created and maintained an illegal secondary gun market, thereby creating and carrying on a public

nuisance." (Emphasis in original.) *Young v. Bryco Arms*, 327 Ill. App. 3d at 965-66.

We also found that the complaint adequately alleged that the nuisance proximately caused the injuries, because

"[t]he defendants *** allegedly intentionally created and maintained an underground market of firearms and deliberately designed, marketed, and sold guns that were targeted to appeal to criminals. In our view, a reasonable trier of fact could find that the criminal misuse of guns killing persons were occurrences that defendants knew would result or were substantially certain to result from the defendants' alleged conduct in the instant case." *Young v. Bryco Arms*, 327 Ill. App. 3d at 970.

That is, the claim against the retailer for creating a public nuisance remained viable precisely because the plaintiff adequately alleged facts showing that the retailer knew that murders were substantially certain to result from the ongoing practice of sales of guns targeted to appeal to criminals.

■ Like the negligent entrustment count, the public nuisance count hinges on the allegation that Midwest expected its sales practices to result in murders and injuries. Because plaintiffs cannot recover damages for public nuisance without proof that Midwest at least expected murders and injuries to result from the sales, the sales pattern and practices alleged in the underlying complaint cannot qualify as accidental.

Gainsco's policy protects Midwest only from loss due to occurrences that are accidental from Midwest's point of view. Again we emphasize that the city and the county do not allege any specific sale that led to the injury of a specific individual for whom the city or the county provided emergency medical services. Therefore, the complaint cannot provide any basis for recovery for injury caused by a single negligent entrustment of a firearm to an individual Midwest should have known to pose an unreasonable risk of harm. Instead plaintiffs rely on allegations of an ongoing pattern of sales practices, especially encouraging sales of multiple guns to straw purchasers from Chicago. The expected result of this pattern of sales practices cannot qualify as an accident. Accordingly, we affirm the trial court's judgment holding that Gainsco had no duty to defend or indemnify Midwest against the lawsuit brought by the city and the county.

Affirmed.

COHEN, P.J., and COUSINS, J., concur.