FIRST DIVISION
May 12, 2008

No. 1-07-0121

| | | |
|---|---|---|
| JOAN A. WOLFENSBERGER and PARESH SONANI, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | |
| DAVID EASTWOOD, and ILLINOIS NATIONAL INSURANCE COMPANY, an Illinois Corporation, | ) ) ) ) | |
| Defendants-Appellees. | ) ) | |
| ------------------------------------ | ) ) | |
| ILLINOIS NATIONAL INSURANCE COMPANY, | ) ) | |
| Counterclaimant/Cross-Appellant, | ) ) | |
| v. | ) ) | |
| JOAN A. WOLFENSBERGER and PARESH SONANI, | ) ) ) | Honorable James F. Henry, |
| Counterdefendants/Cross-Appellees. ) | | Judge Presiding. |

JUSTICE WOLFSON delivered the opinion of the court:

Joan Wolfensberger sued David Eastwood for injuries arising out of a car accident that occurred in the early mornings hours of March 8, 2002. Wolfensberger was a passenger in the car driven by Eastwood. Wolfensberger filed a declaratory judgment action against the liability insurance carrier for Eastwood's employer, seeking coverage for her injuries. Both sides filed motions for summary judgment.

The primary question presented to the trial court was whether Eastwood was acting within the scope of his employment at the time of the accident.  The trial court denied Wolfensberger's motion and granted the insurance carrier's motion.  We affirm the order denying Wolfensberger's motion, but we reverse the order granting the insurance carrier's motion and remand this cause to the trial court for the determination of the factual issues.

FACTS

In March 2002, Wolfensberger and Eastwood were employees of Accenture, LLP (Accenture), a worldwide consulting business.  Accenture operated a training facility in St. Charles, Illinois, for its employees.  The facility contained sleeping rooms, conference rooms, and a cafeteria.  On the week of the accident, Wolfensberger and Eastwood traveled from Philadelphia and Ohio, respectively, to attend training programs at the facility.  Eastwood drove to the facility in his wife's car.  Wolfensberger was teaching a training session.  Eastwood was attending a separate session.

On the evening of March 7, 2002, Wolfensberger, Eastwood, and another Accenture employee, Per-Anders Wendin, met in the social center at the St. Charles facility.  They drank at the social center until around midnight, when the center closed.

The three left the facility and went to a bar called

Scotland Yard. Eastwood drove. Scotland Yard was closing as they arrived. They then drove to a bar called the Cadillac Ranch. They stayed until about 3:30 a.m. on March 8, 2002. After leaving the Cadillac Ranch, Eastwood crossed the median and began driving in the opposite lane of traffic. The car collided with another vehicle. Wolfensberger was injured. Eastwood and Wendin were unhurt.

Wolfensberger filed a personal injury action against Eastwood. Eastwood tendered his defense to his personal insurance carrier, Geico Insurance (Geico), and to Accenture's carrier, Illinois National Insurance Company (Illinois National). Illinois National denied coverage and never filed an appearance on behalf of Eastwood.

The parties entered into a settlement agreement for a total of $5 million to Wolfensberger and $20,000 to Paresh Sonani, a separate party who was injured in the accident.[1] The circuit court approved the settlement. The parties agreed Geico would pay Wolfensberger $285,000 and Sonani $15,000, the total of the $300,000 policy limit. The remainder of the settlement was to be satisfied under Accenture's primary and umbrella auto liability policies issued by Illinois National "to the extent another court finds such policies applicable to David Eastwood and/or the

---

[1]Sonani did not file a brief in this appeal.

alleged occurrence."  The primary policy has a $1,000,000 liability limit.  The umbrella policy pays on behalf of the insured "those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay," up to $50,000,000. Eastwood assigned his rights against Illinois National to Wolfensberger.

Wolfensberger filed a declaratory judgment action against Illinois National.  Illinois National filed a counterclaim for declaratory judgment.

Both sides filed motions for summary judgment.  The trial court denied plaintiff's motion and granted the defendant's motion.

The trial court found neither the umbrella policy nor the primary policy provided coverage because Eastwood was not acting within the scope of his employment at the time of the accident. Wolfensberger appeals the court's judgment.  Illinois National cross-appeals the trial court's factual finding that Eastwood was a "named insured" under the umbrella policy.

DECISION

Plaintiff contends the trial court erred in granting Illinois National's summary judgment motion.  Specifically, plaintiff contends the trial court erred in determining Eastwood was not acting in the "business or personal affairs" of Accenture

4

at the time of the accident, as required by the "Employees as Insureds" endorsement in Accenture's commercial auto liability policy, the primary policy.

We review de novo a trial court's grant of summary judgment. Rich v. Principal Life Insurance Co., 226 Ill. 2d 359, 370, 875 N.E.2d 1082 (2007). The construction of an insurance policy is also a question of law we review de novo. Rich, 226 Ill. 2d at 370-71.

Our primary objective in construing the language of an insurance policy is to determine and give effect to the intention of the parties as expressed by the words of the policy. Rich, 226 Ill. 2d at 371; Profitt v. One Beacon Insurance, 363 Ill. App. 3d 959, 962, 845 N.E.2d 715 (2006). "If the words used in a policy are clear and unambiguous, they must be given their plain, ordinary, and popular meaning, and the policy will be applied as written, unless it contravenes public policy." Rich, 226 Ill. 2d at 371; Profitt, 363 Ill. App. 3d at 962. A contract is not ambiguous, however, simply because the parties disagree on a provision's meaning. Rich, 226 Ill. 2d at 371; Central Illinois Light Co. v. Home Insurance Co., 213 Ill. 2d 141, 153, 821 N.E.2d 206 (2004).

We consider only reasonable interpretations of the policy language, and we will not strain to find an ambiguity where none

exists. Rich, 226 Ill. 2d at 371. " 'Although policy terms that limit an insurer's liability will be liberally construed in favor of coverage, this rule of construction only comes into play when the policy is ambiguous.' " Rich, 226 Ill. 2d at 371, quoting Hobbs v. Hartford Insurance Co. of the Midwest, 214 Ill. 2d 11, 17, 823 N.E.2d 561 (2005).

I. Scope of Employment

At issue in this case is whether Eastwood was using a covered automobile in Accenture's "business or personal affairs" when he was driving back from the Cadillac Ranch. The primary policy includes an "Employees as Insureds" endorsement. It provides: "Any employee of yours [Accenture's] is an 'insured' while using a covered 'auto' you don't own, hire or borrow in your business or your personal affairs." A "covered auto" includes a personal automobile owned by an employee or the employee's family.

The use of the term "personal affairs" in the "employees as insureds" endorsement makes this case unique in this State. Plaintiff contends the "personal affairs" language added coverage to the policy for employee activities that might not be strictly business related, such as after-hours social networking for the benefit of Accenture. While Illinois has not considered the use of the term "personal affairs" in an "Employees as Insured"

endorsement, other jurisdictions have interpreted phrases such as "in your business or your personal affairs" to protect "employees while acting in the scope of their employment." See <u>Wausau Underwriters Insurance Co. v. Baillie</u>, 281 F. Supp. 2d 1307, 1316 (M.D. Fla. 2002). We agree with this interpretation and find the relevant question here is whether Eastwood was acting in the scope of his employment for some corporate purpose when the accident occurred.

Although not raised by the parties, we first address the question of whether summary judgment is appropriate in this case.

Summary judgment is appropriate only where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2006). The purpose is not to try an issue of fact, but rather to determine whether a triable issue of fact exists. <u>Giannoble v. P & M Heating and Air Conditioning</u>, 233 Ill. App. 3d 1051, 1056, 599 N.E.2d 1183 (1992).

Illinois courts have not discussed the propriety of granting summary judgment on a scope of employment issue within the context of an "Employees as Insured" endorsement. However, <u>Respondeat</u> <u>superior</u> cases, which both parties cite as relevant to

this case, have uniformly held "[s]ummary judgment is generally inappropriate when scope of employment is at issue." Pyne v. Witmer, 129 Ill. 2d 351, 359, 543 N.E.2d 1304 (1989); Giannoble, 233 Ill. App. 3d at 1056. "Only if no reasonable person could conclude from the evidence that an employee was acting within the course of employment should a court hold as a matter of law that the employee was not so acting." Pyne, 129 Ill. 2d at 359; Giannoble, 233 Ill. App. 3d at 1056.

In this case, both sides submitted evidence on the issue of whether Eastwood was using his car in Accenture's "business or personal affairs" at the time of the accident.

Plaintiff presented evidence that:

- It was the practice for Accenture managers to take their teams out on a weekly basis for purposes of networking, team-building, and morale-boosting. One purpose of networking was for employees to become staffed on future projects. Eastwood and Wendin Depositions; Wendin Affidavit.

- Accenture encouraged traveling employees to socialize and recreate with fellow employees and with clients on a regular basis. This type of networking also occurred during training. Employees "networked" with fellow employees to exchange knowledge and experience.

Eastwood and Wendin Depositions.

- Accenture managers and partners were entitled to reimbursement for expenses incurred at such events, including expenses for alcohol. Eastwood, Wendin, and Wolfensberger were managers at Accenture. Eastwood and Wendin Depositions.

- At the Cadillac Ranch on March 8, 2002, Eastwood was engaging in general "networking within the Accenture community." He was not looking to get staffed on a project. Eastwood Deposition.

- It was a "common occurrence" and a "tradition" for Accenture employees to go to the Cadillac Ranch on Thursdays during training. Eastwood and Wendin Depositions.

- Wendin had been to the Cadillac Ranch on other visits, "when Accenture sponsored or encouraged the activity." Wendin Affidavit.

- Eastwood had the discretion to submit his entertainment expenses to Accenture for the events of March 7-8, 2002, but he chose not to. Eastwood Deposition. Wendin had the discretion to submit his expenses, but he did not remember if he did so. Wendin Affidavit.

- Wendin discussed work-related topics with Eastwood and

Wolfensberger at the Accenture social center and at the Cadillac Ranch.  Wendin Affidavit and Deposition.

- An employee in Wendin's training group arranged for shuttle transportation to the Cadillac Ranch at 7 p.m. on March 7, 2002.  Wendin, Eastwood, and Wolfensberger missed the shuttle because they had to work.  When they left the St. Charles facility, they were attempting to catch up with other employees from the training facility.  They went to Scotland Yard first because they knew the group would be at one of the two bars. They saw and spoke with fellow employees at the Cadillac Ranch.  Eastwood and Wendin Depositions.

- In the opinions of Eastwood and Wendin, Accenture "sponsored" the outing at Cadillac Ranch on March 7-8, 2002.  "It's just a cultural thing.  It's a thing that Accenture people go and do around training."  Eastwood Deposition.

- "[T]hey scheduled the training in a way that we could use the evening to go out.  Executive--Accenture managers invited the group to go out.  The transportation was paid for by Accenture, and *** more than 90 percent, if not 100, of everything that was consumed that evening was billed back to Accenture."

10

Wendin Deposition.

● At the Cadillac Ranch, Wolfensberger heard Eastwood discussing technical work-related matters with other Accenture employees. Wolfensberger Deposition.

Defendant presented evidence that:

● Eastwood and Wendin admitted there was no formal announcement about a gathering or event at the Cadillac Ranch on March 7, 2002. They did not remember who arranged for shuttle transportation for Accenture employees to go to a bar outside the campus. Eastwood and Wendin Depositions.

● Eastwood and Wendin were scheduled to attend a training class at the St. Charles facility at 8 a.m. on Friday, March 8, 2002. Wolfensberger was scheduled to attend a breakfast meeting at 6:30 a.m. on March 8, 2002. Eastwood and Wolfensberger Depositions; Wendin Affidavit.

● No employee attending or teaching a training class at the St. Charles facility was permitted a per diem allowance. Affidavit of Mary Fulton, Accenture U.S. Employee Relations & Policy Lead.

● Eastwood was not entitled to reimbursement for any amounts incurred at the Cadillac Ranch, whether for

11

"networking," "talking shop," or socializing with other employees.  <u>Fulton Affidavit</u>.

- In March 2002 and for five years prior, "Accenture did not promote, endorse, encourage, sponsor, host, announce, or advertise any events, affairs or gatherings of Accenture employees, for any purpose, at the Cadillac Ranch in Bartlett, Illinois."  <u>Fulton Affidavit</u>.

- "Accenture *** understands that its employees will socialize and 'network' with other employees while either teaching or attending training programs and while in residence at the training facility. *** There was and is a Social Center within the training facility for the use of Accenture employees to socialize and network while in residence at the training facility."  <u>Affidavit of Andrew White, Accenture Director of Training Operations</u>.

- "Since 1992, other than officially sponsored events, Accenture has not required or encouraged its employees to socialize and/or network at locations or establishments outside of the training facility particularly during early morning hours after the Social Center had closed."  <u>White Affidavit</u>.

12

- "[A]s a matter of policy, Accenture directed the training instructors not to organize social events outside the training center where alcohol is served to the attendees." White Affidavit.

- "To the best of my knowledge, Accenture has never sponsored, required or encouraged any social or networking event at the Cadillac Ranch tavern." White Affidavit.

- "Accenture's expectations and intent for purchasing the 'Employees as Insureds' endorsement to the Policy were that employees would be covered as additional 'Insureds' only while engaged in Accenture's business affairs." Affidavit of Amy L. Daniels, Accenture Director of Global Risk Management & Insurance.

- "At no time did Accenture expect or intend that employees attending training at its St. Charles, Illinois facility who left the Accenture training campus for recreational drinking or socializing would be covered as acting in the 'business or personal affairs' of Accenture." Daniels Affidavit.

- The "employees as insureds" endorsement "is a standard insurance industry form" that "is not intended to extend coverage to employees who are engaged in their

13

own personal affairs or to employees who are acting outside the course and scope of their employment." Affidavit of Thomas Sheridan, underwriting consultant with American International Group Companies (AIG), of which Illinois National is a member.

- "The use of the language 'personal affairs' in the endorsement was included because this standard endorsement is used not only for corporations and larger business entities, but also for policies issued to individuals and sole proprietors." Sheridan Affidavit.

After reviewing the record, we find material questions of fact and witness credibility exist on the question of whether Eastwood was acting within the scope of his employment when plaintiff was injured in the auto accident on March 8, 2002. See Davila v. Yellow Cab Co., 333 Ill. App. 3d 592, 601, 776 N.E.2d 720 (2002).

Many of the facts presented by the parties stand in direct contradiction to each other. For example, Mary Fulton, Accenture's U.S. Employee Relations & Policy Lead, said Eastwood was not entitled to reimbursement for any amounts incurred at the Cadillac Ranch, whether for "networking," "talking shop," or socializing with other employees. Eastwood, however, said he had

14

the discretion to submit his entertainment expenses to Accenture for the event at the Cadillac Ranch, but chose not to do so after the accident. Wendin said he also had the discretion to submit his expenses, but he did not remember if he did so. Andrew White, Accenture's Director of Training Operations, said that, "other than officially sponsored events, Accenture has not required or encouraged its employees to socialize and/or network at locations or establishments outside of the training facility particularly during early morning hours after the Social Center had closed." Wendin, however, said: "[Accenture] scheduled the training in a way that we could use the evening to go out. Executive--Accenture managers invited the group to go out. The transportation was paid for by Accenture, and *** more than 90 percent, if not 100, of everything that was consumed that evening was billed back to Accenture." Eastwood said that in his opinion, Accenture "sponsored" the outing at Cadillac Ranch, noting: "It's just a cultural thing. It's a thing that Accenture people go and do around training."

Based on the totality of the evidence before us, we cannot say that, as a matter of law, no reasonable person could conclude Eastwood was acting within the scope of his employment when the accident occurred. The conflicting facts presented by the parties in support of their respective summary judgment motions

required the trial court to make credibility determinations and weigh the evidence in order to reach a decision, which is inappropriate in summary judgment proceedings.  See AYH Holdings, Inc. v. Avreco, Inc., 357 Ill. App. 3d 17, 42, 826 N.E.2d 1111 (2005).

We reverse the trial court's entry of summary judgment in favor of Illinois National and remand for further proceedings consistent with our opinion.  See Pyne, 129 Ill. 2d at 359; Davila, 333 Ill. App. 3d at 603.

While we are sending this case back for trial, we acknowledge that other issues might have to be resolved, depending on the outcome of the trial on the scope of employment issue.  We will attempt to offer some guidance.

II. Umbrella Policy--Definition of Named Insured

Illinois National cross-appeals the part of the trial court's order finding Eastwood was a "named insured" under Endorsement #21 of the Umbrella Policy.  Because Illinois National was a successful party, we decline to provide it with a right to cross-appeal the trial court's judgment.  Illinois Central R.R. Co. v. Accident and Casualty Co. of Winterthur, 317 Ill. App. 3d 737, 744, 739 N.E.2d 1049 (2000) ("Even though a successful party may not agree with the reasons, conclusions or findings of the lower court, it is improper to provide that

successful party with a forum in a reviewing court.")  However, since the judgment is entirely in Illinois National's favor, a cross-appeal is not required in order for us to address specific findings adverse to it.  See <u>Illinois Central R.R. Co.,</u> 317 Ill. App. 3d at 744.  We will address the issues presented by Illinois National.

There are two provisions of the Umbrella Policy that could apply to Eastwood--the "named insured" provision in Endorsement #21, and section E.5 of the definitions section.  Section E.5 defines an insured as:

> "Any of your partners, executive officers,
> directors, stockholders or employees but
> only while acting within their duties.
>
> However, the coverage granted by this
> provision 5, does not apply to the ownership,
> maintenance, use, loading or unloading of any
> <u>autos</u>, aircraft, or watercraft unless such
> coverage is included under the policies
> listed in the Schedule of Underlying
> Insurance and then for no broader coverage
> than is provided under such underlying
> policies."  (Emphasis in original).

In other words, Accenture employees are covered by section E.5

17

where they are using an auto "in the business or personal affairs" of Accenture, or where they are acting "within their duties."

In the trial court, the plaintiff argued Eastwood also was covered as a "Named Insured" under Endorsement #21 of the Umbrella Policy, without regard for whether Eastwood was acting within the scope of his employment. At the time of the accident, Endorsement No. 21 ("Original Endorsement") defined the "named insured" as:

> "Accenture, L.L.P. and all partnerships, firms, corporations, entities and individuals, wherever located, which together comprise 'The Accenture Worldwide Organization' whether by virtue of their member firm interfirm agreements with Accenture Partners Societe Cooperative (or any successor thereto acting to coordinated [sic] the business of such entities) or by vite [sic] of ownership, direct or indirect, by such an entity or otherwise being under the control of or under the common control, directly or indirectly, with such an entity and which are thereby deemed part of

18

Accenture."

An amended version of Endorsement No. 21 ("Amended Endorsement") was formally issued sometime after the accident.  It provides:

> "In consideration of the premium paid, it is hereby understood and agreed that Effective May 31, 2001 Item 1, on the Declarations Page, Named Insured is amended as follows:
>
> Accenture shall mean Accenture Ltd, Accenture SCA and their affiliates.
>
> An affiliate shall be defined as any entity wholly-owned, directly or indirectly by Accenture Ltd or which controls, is controlled by or is under the common control with Accenture or its successors or assigns. Control shall mean the ability, directly or indirectly to direct the affairs of another whether by way of contract, ownership of shares or otherwise."

Absent from the Amended Endorsement was any reference to "individuals."  The parties agree the Amended Endorsement was not officially issued until April 2002 at the earliest, after the accident.

The defendant contends the Amended Endorsement was

inadvertently omitted from the policy and supercedes the Original Endorsement, that there was a "meeting of the minds" before the accident. Under the Amended Endorsement, Eastwood would not be covered. The plaintiff, of course, disagrees, urging the vitality of the Original Endorsement. Alternatively, defendant contends the Original Endorsement excludes coverage for Eastwood because the provision was not intended to cover employees, that Section E.5 performs that task.

We agree with defendant's alternative argument. The Original Endorsement defines as a "named insured": "Accenture, L.L.P. and all partnerships, firms, corporations, entities, and individuals, wherever located, which together comprise 'The Accenture Worldwide Organization'." It further describes the above entities as "by virtue of their member firm interfirm agreements *** or by [virtue] of ownership, direct or indirect, by such an entity or otherwise being under the control of or under the common control, directly or indirectly, with such an entity."

It is undisputed that Eastwood does not meet the requirements in the latter part of the definition. We find Eastwood is not covered under the language of the Original Endorsement. The general rules governing interpretation of contracts also govern interpretation of insurance policies.

<u>Illinois Farmers Insurance Co. v. Hall</u>, 363 Ill. App. 3d 989, 993, 844 N.E.2d 973 (2006). Because the policy language is unambiguous, we will take the policy as written. See, <u>Hall</u>, 363 Ill. App. 3d at 993.

We agree with defendant that to hold Eastwood is covered under the Original Endorsement without regard for whether he was acting within the scope of his employment would render section E.5 superfluous and meaningless. A court will not interpret a contract in a way that will render any provision meaningless. <u>Hall</u>, 363 Ill. App. 3d at 996.

If the trial court finds Eastwood was not acting within the scope of his employment at the time of the accident, he would not be covered under section E.5 or any other section of the Umbrella Policy, including either version of Endorsement #21. If the court finds Eastwood was acting within the scope of his employment, he would be covered under section E.5.

Whether the Original Endorsement #21 or the Amended Endorsement #21 was in effect at the time of the accident does not matter. Neither endorsement covers Eastwood's actions as an employee. When possible, courts should construe a contract so that different provisions are harmonized, not conflicting with one another. <u>General Agents Insurance Co. of America, Inc. v. Midwest Sporting Goods Co.</u>, 328 Ill. App. 3d 482, 487, 765 N.E.2d

21

1-07-0121

1152 (2002).  Our reading of the policy harmonizes the provisions.

CONCLUSION

We affirm the trial court's order denying plaintiff's motion for summary judgment and reverse the order granting defendant's motion for summary judgment.  We remand the cause for trial on the issue of whether Eastwood was acting within the scope of his employment at the time of the accident and for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

GARCIA, and R. GORDON, JJ., concur.